## WASHINGTON COUNTY, NEB., v. WILLIAMS.

## BLAIR et al. v. WASHINGTON COUNTY, NEB., et al.

(Circuit Court of Appeals, Eighth Circuit. October 28, 1901.)

Nos. 1,533, 1,486.

1. MUNICIPAL BONDS—NEGOTIABILITY—CONDITIONAL PROMISE.

Bonds issued by a county which acknowledge an indebtedness in a certain sum, and promise to pay the same to the payee or bearer from a special fund to be raised by the annual levy of a specified rate of tax on the taxable property of the county,—such fund to be applied pro rata on such bonds, first to the payment of the interest, and then the principal,—are not negotiable instruments, within the law merchant, because there is no certainty as to the fact or time of payment, which depends entirely on the adequacy of the fund; nor are they negotiable instruments under Consol. St. Neb. § 2968.

2. SAME—STATUTORY POWER TO ISSUE—EFFECT OF RECOGNITION OF VALIDITY.

While obligations issued by a municipal corporation cannot acquire validity through the operation of the doctrine of estoppel if the corporation was without statutory power to issue them in the first instance, yet, where the act from which the power is derived is susceptible of different constructions, and the right to issue bonds is doubtful, the fact that they have been recognized by the municipality and its citizens as valid for a long number of years, during which it has paid interest thereon without objection, will entitle the holders to a more liberal construction of the statute under which the power was claimed and exercised than would be given it if their validity had been challenged before their issuance or soon thereafter.

3. COUNTIES—POWER TO AID IN CONSTRUCTION OF RAILROADS—CONSTRUCTION OF NEBRASKA STATUTE.

Rev. St. Neb. c. 9 (Act Neb. T. Jan. 11, 1861, § 24), gave the board of commissioners of any county power to submit to the people of the county the question whether the county should aid in the construction of "any road or bridge," and to extend such aid if a majority voted in favor of the proposition. It also provided that the commissioners might "aid any enterprise designed for the benefit of the county," when authorized by a vote of a majority of the people. Other provisions required the question submitted to include the levy of a tax for the payment of any indebtedness authorized, not to exceed, in case it was to aid in the construction of a road or bridge, the rate of one mill on the dollar of the assessed valuation of the property of the county. Assuming to act under the power conferred by such statute, and by proceedings in accordance therewith, a county voted to issue bonds to aid in the construction of a railroad; the interest and principal to be paid from the proceeds of a one-mill tax, which was authorized to be levied for the purpose. The railroad was constructed, the bonds were issued, and for 28 years the county continued to levy the tax, and to apply the proceeds in payment of the interest thereon. The bonds in the meantime passed into the hands of different holders. *Held* that, under the liberal construction required under such circumstances, the phrase "any road," as used in the statute, must be construed as broad enough to include a railroad, and that the bonds were valid.

4. MUNICIPAL BONDS—EFFECT OF REFUSAL TO PAY—RIGHTS OF HOLDER.

Where bonds issued by a county expressly provided that they should be paid, both principal and interest, from a special fund to be created by the levy of an annual tax at a fixed rate on the taxable property of the county, the refusal of the county to longer levy the tax, or to make any further payments on the bonds, does not entitle the holder to recover a judgment for the full amount of the bonds and accrued interest, but his right is limited to a recovery of the amount due under the terms of the contract.

111 F.—51

5. JURISDICTION OF FEDERAL COURTS—AMOUNT IN CONTROVERSY.

Where plaintiff sued to recover the principal of bonds and accrued interest, amounting to over $2,000, the fact that he is adjudged to be entitled to a judgment for a part of the sum sued for, and less than $2,000, does not deprive a federal court of jurisdiction to render such judgment, unless it appears that the excessive demand was made in bad faith, for the sole purpose of giving such court jurisdiction.[1]

6. EQUITY JURISDICTION—ADEQUATE REMEDY AT LAW—SUIT BY HOLDERS OF MUNICIPAL BONDS.

A county issued a series of bonds, payable to bearer, in which it promised to pay thereon, pro rata, the proceeds of an annual tax to be levied at a certain rate upon the taxable property of the county, until the principal and interest should be paid. *Held*, that each holder of such bonds had a separate right of action at law to recover his pro rata share of the fund created by such tax, or which was due him under the terms of the contract, and that the several bondholders could not unite and jointly maintain a suit in equity to obtain a decree establishing the validity of the bonds, and recovery of the amount due thereon, on the repudiation of the obligations by the county; the remedy of each at law being adequate, and as effective as that in equity, and the case not being one in which equity had jurisdiction on the ground of avoiding a multiplicity of suits.

Sanborn, Circuit Judge, dissenting from proposition that court of equity is without jurisdiction.

In Error to the Circuit Court of the United States for the District of Nebraska.

Appeal from the Circuit Court of the United States for the District of Nebraska.

These are two cases, one at law and the other in equity, which in the main involve the same questions, and have been argued and briefed together. The controversy arises out of the following facts:

On July 1, 1869, Washington county, in the state of Nebraska, executed and delivered to the Sioux City & Pacific Railroad Company 149 obligations, in the following form:

"State of Nebraska. Washington County.

"Five Hundred Dollar R. R. Bond. $500.00.

"Be it known, that the county of Washington, in the state of Nebraska, acknowledges itself to owe and to stand indebted to the Sioux City & Pacific Railroad Company in the sum of five hundred dollars, which sum the board of county commissioners of said county, in the name and on behalf of the said county, hereby promises to pay to said Sioux City & Pacific Railroad Company or bearer, at the office of the county treasurer of said county, with interest at the rate of seven per cent. per annum, which principal and interest are to be raised and paid by an annual levy of a tax of one mill on the dollar on the entire taxable property in said county, and the sum to be raised by taxation is to be applied first in the payment of the interest on this and 149 other bonds of the same date and amount, and next in the payment of the principal sum and annually accruing interest, until the whole of the principal and interest shall have been paid and extinguished, and which payments are to be made on the first day of July next following the date hereof, and annually thereafter on the first day of July. This obligation is one of a series numbered from one (1) to one hundred and fifty (150), each for the sum of $500, and in the aggregate amounting to $75,000, issued by the said county of Washington to aid in the construction of the Sioux City and Pacific Railroad from a point on the Missouri river in Wash-

---

[1] Jurisdiction of circuit courts as determined by amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Tennett-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.

ington county aforesaid, and running thence westerly through said county, forming a connection with the Union Pacific Railroad at or near Fremont, in Dodge county, in accordance with a vote of the electors of said county of Washington at an election held on the ninth day of June, 1868, for the purpose of taking a vote on the proposition to aid the said railroad company in the construction of said railroad by the board of county commissioners of said county executing and delivering to said railroad company the bonds of said county calling for the payment of $75,000, with interest at the rate of seven per cent. per annum, and to be paid by an annual levy of a tax of one mill on the dollar of the entire taxable property of said county until such time as the amount thus raised will extinguish the whole amount of the principal and interest and accruing interest, which proposition was submitted and adopted under the provisions of the ninth chapter of the Revised Statutes of the State of Nebraska. The said railroad having been built by the said railroad company after the adoption of said proposition as contemplated therein, and within the time therein mentioned, this bond, with the others of the series above mentioned, is issued in pursuance thereof, as well also as under the provisions of an act of the legislature of the state of Nebraska approved February 15, 1869, entitled 'An act to enable counties, cities and precincts to borrow money on their bonds, or to issue bonds to aid in the construction or completion of works of internal improvement in this state, and to legalize bonds already issued for such purposes.'

"In testimony whereof, we, the board of county commissioners of said county of Washington, have hereunto set our hands and caused the seal of said county to be affixed on this first day of July, A. D. 1869.

"[Seal of Washington County    Alonzo Perkins,
Commissioners' Court,    Watson Tyson,
Nebraska.]    Commissioners.

"P. N. Besmer, County Clerk."

It appears to have been the intention of the county to issue 150 of such obligations, but, as a matter of fact, only 149 were issued, making the aggregate amount of the indebtedness incurred $74,500.

The ninth chapter of the Revised Statutes of Nebraska, which is referred to in said obligations, was an act passed by the legislative assembly of the territory of Nebraska on January 11, 1861. Laws Neb. 1860-61, pp. 146 to 153, inclusive. That act contained, in part, the following provisions:

"Sec. 24. The said commissioners shall have power to submit to the people of the county, at any regular or special election, the question whether the county will borrow money to aid in the construction of public buildings; the question whether the county will aid, or construct any road or bridge, or to submit to the people of the county any question involving an extraordinary outlay of money by the county; and said commissioners may aid any enterprise designed for the benefit of the county as aforesaid, whenever a majority of the people thereof shall be in favor of the proposition as provided in this section."

"Sec. 26. The mode of submitting the questions to the people, contemplated by the last two sections, shall be the following: The whole question, including the sum desired to be raised, or the amount of tax desired to be levied, or the rate per annum, and the whole regulation, including the time of its taking effect, or having operation, if it be of a nature to be set forth, and the penalty of its violation, if there be one, is to be published at least four weeks in some newspaper published in the county. If there be no such newspaper the publication is to be made by being posted up in at least one of the most public places in each election precinct in the county, and in all cases the notices shall name the time when such question will be voted upon, and the form in which the question shall be taken, and a copy of the question submitted shall be posted up at each place of voting during the day of election.

"Sec. 27. When the question submitted involves the borrowing or expenditure of money, the proposition of the question must be accompanied by a provision to lay a tax for the payment thereof, in addition to the usual taxes under section sixteen, of this act; and no vote adopting the question

proposed shall be valid, unless it likewise adopt the amount of tax to be levied to meet the liability incurred.

"Sec. 28. The rate of tax levied in pursuance of the last four sections of this act, shall, in no case, exceed more than three mills on the dollar, of the county valuation in one year. When the object is to borrow money to aid in the erection of public buildings, as provided, the rate shall be such as to pay the debt in ten years. When the object is to construct or aid in constructing any road or bridge, the annual rate shall not exceed one mill on a dollar of the valuation; and any special tax or taxes levied in pursuance of this act, becoming delinquent, shall draw the same rate of interest as ordinary taxes levied in pursuance of the revenue law of this territory.

"Sec. 29. The said commissioners being satisfied that the above requirements have been substantially complied with, and that a majority of the votes cast are in favor of the proposition submitted, shall cause the same to be entered at large upon the book containing the record of their proceedings; and they shall then have power to levy and collect the special tax in the same manner that the other county taxes are collected. Propositions thus acted upon can not be rescinded by the board of county commissioners.

"Sec. 30. Money raised by the county commissioners in pursuance of the last six sections of this act, is specially appropriated and constituted a fund distinct from all others in the hands of the county treasurer, until the obligation assumed is discharged."

While this law was in force, and on June 9, 1868, an election was held in conformity therewith for the purpose of taking the sense of the people on a proposition to aid the Sioux City & Pacific Railroad Company in the construction of its road from a point on the Missouri river to a junction with the Union Pacific Railroad at or near Fremont, Neb.; and at such election the proposition to aid in the construction of such road in the manner and to the amount indicated in the obligation above quoted was duly approved, and such aid was authorized by the people. While said road was in process of construction, and after it had been for the most part completed, the legislature of the state of Nebraska, on February 15, 1869, passed another act (Laws Neb. 1869, p. 92), entitled "An act to enable counties, cities and precincts to borrow money on their bonds, or to issue bonds to aid in the construction or completion of works of internal improvement in this state, and to legalize bonds already issued for such purpose." This act contained the following provisions:

"Section 1. Be it enacted by the legislature of the state of Nebraska, that any county or city in the state of Nebraska is hereby authorized to issue bonds to aid in the construction of any railroad, or other work of internal improvement, to an amount to be determined by the county commissioners of such county or the city council of such city, not exceeding ten per centum of the assessed valuation of all taxable property in said county or city, provided the county commissioners, or city council, shall first submit the question of the issuing of such bonds, to a vote of the legal voters of said county or city, in the manner provided by chapter nine of the Revised Statutes of the State of Nebraska, for submitting to the people of a county, the question of borrowing money.

"Sec. 2. The proposition of the question must be accompanied by a provision to levy a tax for the payment of the principal and interest of said bonds in addition to the usual taxes, and sufficient to meet the payment of the principal and interest of said bonds, and to continue from year to year until said bonds are paid."

"Sec. 5. It shall be the duty of the proper officers of such city or county, to cause to be annually levied, collected and paid to the holder of such bonds a special tax upon all taxable property within said county or city, sufficient to pay the annual interest, and finally to pay the principal thereof, which tax, when levied, shall be a lien upon all of the taxable property in said county or city, and shall be collected in the same manner as the ordinary tax of such county or city.

"Sec. 6. Any county or city which shall have issued its bonds in pursuance of this act shall be estopped from pleading want of consideration therefor,

and the proper officers of such county or city may be compelled, by manda-mus or otherwise, to levy the tax herein provided to pay the same."

The Sioux City & Pacific Railroad Company completed its road, as pro-jected, in the spring of 1869; and the obligations aforesaid were delivered to it on July 1, 1869, without any further vote than that taken on June 9, 1868. These obligations have since passed into the hands of numerous hold-ers. The county levied taxes at the rate specified in the obligations for 28 years, and applied the proceeds of the levies pursuant to the agreement evi-denced by said obligations; but the sum realized by a one-mill levy proved insufficient to discharge the interest in full, and nothing has as yet been paid on the principal. On September 14, 1899, the county of Washington, acting by its board of supervisors, refused to pay further interest on said obliga-tions. and denied the liability of the county thereon. Thereupon the above-entitled actions were brought; the first being an action at law which was brought by J. Bertram Williams, who owns five of the obligations, to recover the entire amount due thereon,—both the principal sum and interest,—upon the theory that the action taken by the county in September, 1899, in deny-ing its liability, renders the entire amount due and payable. The second ac-tion was brought by De Witt C. Blair, as executor, et al., and is a proceeding in equity, in which substantially all of the holders of the obligations in ques-tion have joined as complainants against the county, to obtain a decree declaring the validity of the obligations, and to obtain such further general relief as they may be adjudged to be entitled to. In the law case the plain-tiff below recovered a judgment, as prayed, for the amount of the five obliga-tions which he holds, and interest. In the equity case the county prevailed, and the bill was dismissed for want of equity. Both records have been re-moved to this court by the losing parties, and are before us for review.

John L. Kennedy and F. S. Howell (Herman Aye, on the briefs), for Washington county.

W. J. Courtright and F. Dolezal (B. T. White and J. B. Sheean, on the briefs), for J. Bertram Williams, De Witt C. Blair, and others.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

In behalf of Washington county it is claimed that the obligations executed by it on July 1, 1869, one of which is set forth in full in the foregoing statement, were executed without authority of law, and are invalid in the hands of any holder thereof. It is urged, in sub-stance, that the obligations in question were not authorized by the provisions of the "ninth chapter of the Revised Statutes of the State of Nebraska," which is referred to therein, and under which an elec-tion to authorize the issuance of the obligations was held, because that chapter of the Revised Statutes (the same being an act which was approved on January 11, 1861) did not contemplate or authorize the granting of county aid to railroads, and did not authorize the issuance of negotiable bonds, even if such aid was contemplated. And with respect to the act of February 15, 1869, which did con-template the issuance of railroad aid bonds, it is said that the obliga-tions in suit cannot be supported under that act, because it required a popular vote before bonds could be lawfully issued, and that the obligations in suit show on their face that no such vote was taken under the act of February 15, 1869; the election specified in the recital being one which was held on June 9, 1868, pursuant to the act

of January 11, 1861, long before the act of February 15, 1869, was passed and approved. These contentions present the principal questions to be discussed on appeal.

Conceding it to be true that the twenty-fourth section of the act of January 11, 1861, supra, did not authorize the county to make a donation of negotiable bonds in aid of the construction of railroads, or to issue such bonds for any purpose other than the construction of public buildings, and conceding for present purposes that the power to issue negotiable securities, when claimed by a municipal corporation, must be either expressly conferred, or derived by implication from an express power to borrow money or to purchase stock and pay for the same with bonds (Kelley v. Town of Milan, 127 U. S. 139, 150, 8 Sup. Ct. 1101, 32 L. Ed. 77; Merrill v. Town of Monticello, 138 U. S. 673, 681, 11 Sup. Ct. 441, 34 L. Ed. 1069; Brenham v. Bank, 144 U. S. 173, 12 Sup. Ct. 559, 36 L. Ed. 390), yet we are of opinion that the obligations in suit are not negotiable bonds, within the rules of the law merchant, and that a purchaser of the same for value in the open market cannot invoke for his protection the doctrine of estoppel by recitals, as it is generally applied in actions upon negotiable municipal bonds. To render a written promise to pay money negotiable in the sense of the law merchant, it is essential that it should be an unconditional promise to pay a certain sum of money at some future time, which is sure to arrive, or, as is more frequently said, there must be "certainty as to the fact of payment." If by the terms of the contract the sum promised to be paid, or a portion thereof, may never become payable, as where the sum promised is not to be paid unconditionally and at all events, but only out of a special fund derived from certain sources, which may not prove adequate to meet the demand in full, the instrument, according to the great weight of authority, cannot be deemed negotiable, and entitled, in the hands of a third party, to the immunities which belong to that class of instruments. Husband v. Epling, 81 Ill. 172, 174, 25 Am. Rep. 273; Blackman v. Lehman, Durr & Co., 63 Ala. 547, 550, 35 Am. Rep. 57; Cota v. Buck, 7 Metc. (Mass.) 588, 41 Am. Dec. 464; Harriman v. Sanborn, 43 N. H. 128, 130; Bank v. Piollet, 126 Pa. 194, 198, 17 Atl. 603, 4 L. R. A. 190, 12 Am. St. Rep. 860; Chicago Ry. Co. v. Merchants' Bank, 136 U. S. 268, 279, 10 Sup. Ct. 999, 34 L. Ed. 349; Daniel, Neg. Inst. §§ 41–43. We have no reason to suppose, and it has never been decided, that section 2968 of the Consolidated Statutes of Nebraska, which defines negotiable instruments, was designed to modify the doctrine aforesaid in any respect, or to declare that an instrument might be negotiable even though it was uncertain as to the fact of payment. The statute, like many other statutes of a similar character, was designed to place bonds and promissory notes on the same plane of negotiability as foreign bills of exchange, provided they possess the requisite words of negotiability, and contain an unconditional promise to pay a certain sum of money at some future time, which is sure to arrive. Now, while the obligations in suit acknowledge an indebtedness on the part of the county of Washington to a certain amount, yet the promise made to pay this indebtedness is not a promise to pay it unconditionally and at all events,.

but is a promise to pay it only out of a fund to be raised by a levy of one mill per dollar on the taxable property of the county, which fund is to be apportioned pro rata among all of the obligations, and applied first to the interest, and next to the indebtedness. It is obvious that the special fund out of which the acknowledged indebtedness is to be paid may never be adequate to pay it; and, as the record discloses, 28 years' experience demonstrates that the fund is inadequate, and that the debt is yearly increasing, instead of diminishing. Under these circumstances, the obligations in suit cannot be regarded as negotiable bonds. They are instruments which merely evidence an obligation on the part of the county to levy a tax of one mill annually on all the property situated within the county, and to apply it to the indebtedness until the same has been fully paid off and discharged. The original holders of the obligations, and all subsequent purchasers thereof, took them with full knowledge of the manner in which the county undertook to pay them, because the method of payment is stated in each obligation, and is an essential part of the contract. The several holders must be regarded as having assumed the risk of the fund proving adequate to pay the debt. For the reason, therefore, that the obligations are not negotiable, the suggestion that the act of January 11, 1861, conferred no authority to issue negotiable bonds, becomes immaterial.

Passing to a consideration of the question whether the twenty-fourth section of the act of January 11, 1861, conferred upon the county the power to aid in the construction of a railroad, we observe in the first place that a more liberal construction should be placed upon the act after this lapse of time, and in view of the conduct of the county for the past 28 years, than would have been permissible if the action of the board of county commissioners had been challenged when they took the first steps, under the act of January 11, 1861, to extend such aid, or if the action of the board had been called in question before the obligations were issued, or shortly thereafter. If the power of the county under that act to extend aid to a railroad had been seasonably challenged, as it might have been, by any taxpayer or citizen of the county, it would have been the duty of any judicial tribunal before which such a proceeding was brought to have construed the act strictly, and to have denied the existence of the power in question unless it was clearly conferred. We conceive, however, that the same rule of interpretation ought not to be applied at the present time. It is true that a municipal corporation cannot be estopped by its previous conduct or by acquiescence from denying the validity of obligations which it may have issued, if in point of fact they were issued without any authority. In other words, such corporations cannot acquire a power which has not been conferred upon them by law, by the operation of the doctrine of estoppel. So much may be conceded. It has been held frequently, however, both by the federal and state courts, that such corporations, by acquiescence in what has been done, as by paying interest for a series of years on obligations which they have issued, and thereby giving them currency in the market, may be estopped from challenging their validity on the ground that they were issued irregularly, or that

some preliminary action which should have been taken was omitted, or not taken at the proper time or in the proper manner. Supervisors v. Schenck, 72 U. S. 772, 781, 782, 18 L. Ed. 556; Clay Co. v. Society for Savings, 104 U. S. 579, 591, 26 L. Ed. 856; Shoemaker v. Goshen Tp., 14 Ohio St. 569, 587; Society for Savings v. City of New London, 29 Conn. 174, 193; Leavenworth, L. & G. R. Co. v. Douglas Co. Com'rs, 18 Kan. 169, 185, 186; Mills v. Gleason, 11 Wis. 470, 490, 78 Am. Dec. 721; President, etc., of Town of Keithsburg v. Frick, 34 Ill. 405. For like reasons, we are of opinion that the citizens and taxpayers of Washington county are not at this time entitled to the same strict construction of the power of the county under section 24 of the act of January 11, 1861, which they might have insisted upon had they objected to the issuance of the obligations in suit at any time before they were executed and delivered, or shortly thereafter. Any citizen or taxpayer of the county had the right to have stayed the execution and delivery of these obligations until the power of the county under the act of 1861 to aid in the construction of a railroad was judicially determined, but the power to extend such aid was not called in question, although nearly one-third of the popular vote at the election held on June 9, 1868, appears to have been cast against the proposition when it was submitted. It is obvious, therefore, that at that time the county officials and the public generally construed the act of 1861 as being broad enough in its provisions to authorize the county to aid in the construction of a railroad. Moreover, the road to which the people of the county voted to extend aid was substantially constructed between June 8, 1868, and the spring of 1869, probably in reliance upon such promised aid; and for more than 28 years taxes were regularly levied by the county authorities, without any protest, so far as these records disclose, upon the assumption, no doubt, that the board of county commissioners had acted within the law, and that the obligations were valid. In view of these facts, we think that the present holders of the obligations in suit are entitled to invoke a liberal construction of the power of the county under the act of 1861. If the intent of the legislature, as manifested by that act, is not altogether clear, and if the act is so worded that different views may fairly be taken of its meaning, or concerning the power intended to be conferred, that view should be adopted which will sustain the obligations in suit, rather than destroy them.

Turning to section 24 of the act of January 11, 1861, it will be seen that it authorized the board of county commissioners of Washington county to submit to the people of the county, at any regular or special election, the question whether the county should aid in the construction of "any road or bridge," and to extend such aid if a majority of the people were in favor of the proposition. In view of other provisions of the act, it is also clear that the legislature contemplated that such aid might consist of a tax to be levied on all the property of the county for a period of years, or until a certain sum had been raised, provided the annual rate of taxation for that purpose did not exceed one mill on the dollar of valuation. The word "road," which was used in that act, is a generic term, and is sufficiently com-

prehensive to include all highways, of whatsoever kind, over which people ordinarily travel, whether they are dirt roads, macadam roads, plank roads, or railroads; and, as if to make the language as comprehensive as possible, the phrase "any road" was employed. It must also be borne in mind that in ordinary conversation a railroad is sometimes termed a "road." Indeed, this use of the word is very common when no occasion exists for specifying the particular kind of road to which reference is made. Aside from this view of the case, showing that the language used was broad enough to include railroads, it is to be observed that the section of the act in question bears internal evidence that the legislature intended to authorize the people of the county to extend public aid to "any enterprise designed for the benefit of the county"; and in view of this fact it may be. fairly argued that the word "road," as employed in the act, comprehends railroads, and that they fall within the legislative intent, because the construction of such roads within or through the county would be fully as beneficial to the county, and tend as much to its speedy development and to increase its wealth and population, as the construction of other highways, such as plank roads, macadam roads, or dirt roads. The authorities which have been cited as bearing upon the question whether the phrase "any road" includes a railroad are not in harmony, and none of them, in our judgment, should be deemed of controlling weight in the case at bar. In Van Hostrup v. City of Madison, 68 U. S. 291, 17 L. Ed. 538, it was held that authority conferred upon a city to take stock "in any chartered company for making a road or roads to said city" empowered such city to take stock in a railroad company which was organized to build a branch road from a point on another railroad already constructed, which latter road entered the city. In the case of Evansville, I. & C. S. L. R. Co. v. City of Evansville, 15 Ind. 395, and in the case of City of Aurora v. West, 9 Ind. 74, 86, it was likewise decided that a power given to a city "to take stock in any chartered company for making roads to said city" conferred adequate authority to take stock in a railroad. And in the case of Dubuque Co. v. Dubuque & P. R. Co., 4 G. Greene, 1, 4, it was decided that an authority given by statute to counties in the state of Iowa to aid in the construction of "any road or bridge" conferred power to aid in the construction of railroads, these being included in the phrase "any road." This view obtained and was followed by the supreme court of Iowa in several later decisions, but it was eventually overruled by a divided court in the case of Stokes v. Scott Co., 10 Iowa, 166. These adjudications demonstrate very clearly that the language employed by the legislature of the state of Nebraska in the act of January 11, 1861, may be interpreted differently, with much reason to support either view, and that it is fairly susceptible of the interpretation which was placed upon it by the county officials of Washington county and by the public generally when the obligations in suit were voted and contracted; and inasmuch as no voice was raised at that time, nor for 28 years thereafter, against an interpretation of the act which made it include railroads, and inasmuch as the road to which aid was voted was built, and the obligations have been in the market, and

circulating from hand to hand, for more than a quarter of a century, in reliance on their validity, no court, in our judgment, should now adopt a different construction of the act, in a controversy between the holders of these obligations and the county. We accordingly conclude that the obligations in suit were authorized by the act of 1861, and in that view of the case it becomes unnecessary to determine whether they were also authorized by the subsequent act of February 15, 1869.

Three other questions are presented by the records, which remain to be considered. The first of these is whether the holders of the obligations in suit at the time the actions were brought could rightfully demand judgment against the county for the full amount of the several obligations and accrued interest. The second is whether the lower court had jurisdiction of the law case, in the event that the last question is answered in the negative. And the third question is whether the holders of the obligations in suit can collectively maintain a bill in equity against Washington county to have the validity of the obligations established, and to obtain a decree against the county for the sum now due thereon and unpaid.

The trial court held, and in the law case rendered its judgment upon the theory, that the refusal of the county on September 14, 1899, to levy further taxes for the purpose of making payments on the obligations in suit, rendered the entire amount of the acknowledged indebtedness immediately payable, notwithstanding the agreement that it should be paid only in annual installments, each installment to be such a sum as might be realized by an annual levy of one mill on the dollar. In so deciding, the trial judge seems to have applied a doctrine which has been applied frequently in actions for the breach of a certain class of contracts, but, in our judgment, is not applicable to a case like the one in hand. The doctrine in question, as stated by the supreme court in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, is, in substance, that where one party to an agreement which is mutually executory, before the time for performance on his part arrives, gives notice that he will not perform it, the opposite party is at liberty to consider himself absolved from all obligations to perform the agreement, and may sue at once for all damages occasioned by the anticipatory breach, or, if he so elects, may wait for the time of performance to arrive, treating the contract in the meantime as prospectively binding for the exercise of this option. In the case last cited, where the subject was elaborately considered and all of the authorities were reviewed, it was held that the doctrine in question has its limitations; that it is only applicable to contracts that are mutually executory, such as contracts for marriage, for the rendition of services, or for the transportation or the sale and delivery of property; and that it has no application to money contracts, pure and simple, where one party has fully performed his undertaking, and all that remains for the opposite party to do is to pay a certain sum of money at a certain time or times. Roehm v. Horst, 178 U. S. 1, 17–19, 20 Sup. Ct. 780, 44 L. Ed. 953. See, also, Nichols v. Steel Co., 137 N. Y. 471, 487, 33 N. E. 561. It has never been held, so far as we have been able to discover, that the

holder of a promissory note, or other written agreement to pay a sum of money at a designated time, can maintain an action thereon, in advance of its maturity, because the maker thereof has announced his intention not to pay it. Now, the obligations in suit can be regarded in no other light than a contract on the part of the county to pay a given sum of money annually until such time as the amount of its donation to the railroad company, and accrued interest thereon, was fully discharged. It was not stipulated in the agreement evidenced by the obligations that a failure to pay one of the annual installments should render the entire amount of the obligation immediately payable, nor can it be successfully claimed that the notice given by the county that it would make no further payments had that effect. If the plaintiff's view is maintained, that the refusal of the county to pay rendered the entire debt immediately payable, and the obligations are enforced accordingly, the county would be compelled to do that which it never promised to do. Such conduct on the part of the county merely rendered it amenable to an action for such part of the indebtedness as was then due according to the terms of the donation. It results from this view that the trial court erred in the law case in rendering a judgment for the full amount of the five obligations, and the accrued interest, which were sued upon in that case. The recovery should have been limited to such annual installments as were then due.

Passing to the second question above stated, we observe that it does not follow from the views last expressed that the trial court was without jurisdiction of the law case because the sum recoverable therein was less than $2,000, exclusive of interest and costs. The amount claimed in the declaration or complaint, not the amount of the recovery, is the test of jurisdiction; and the fact that a sum in excess of $2,000, exclusive of interest and costs, was claimed, gave the trial court jurisdiction to render a judgment for a less amount, unless this court is able to find that a demand for a sum in excess of $2,000 was interposed in bad faith, for no other purpose than to give the federal court jurisdiction. Bank of Arapahoe v. David Bradley & Co., 19 C. C. A. 206, 72 Fed. 867 36 U. S. App. 519. After a careful examination of the records, we fail to discover any evidence which would warrant this court in holding that the plaintiff in the law case demanded a judgment for the full amount of the five obligations by him held, either knowing or believing that he was not entitled to recover the sum claimed, and for the sole purpose of investing the federal court with jurisdiction. Besides, the fact that the learned judge of the trial court sustained the plaintiff's view, and rendered a judgment for the full amount of his claim, should be regarded as sufficient evidence that the claim as made was preferred in good faith, under an honest belief that it was tenable. It follows, therefore, that the contention on the part of the county that the trial court had no jurisdiction of the law case must be overruled.

The third question above mentioned concerns the right of the complainants in the equity case to sue in equity, and with respect to that question it is to be first observed that the causes of action sued upon are clearly of legal cognizance. The actions are founded upon

a promise by the county to pay a certain sum annually out of a fund to be raised by the levy of a tax of one mill on the dollar on all property situated within the county which is subject to taxation. This promise, however, does not run to the holders of the obligations jointly, so as to compel them to unite in a suit to enforce it; for by issuing 149 obligations, each payable to bearer, and by reciting therein, in substance, that the sum raised annually would be apportioned pro rata among all the obligations, the county, in effect, promised to pay to each holder such a portion of the fund as he was entitled to receive. No reason is perceived why each holder of one or more of the obligations in suit may not sue at law, as one of them has already done, and obtain a judgment for the sum due to himself, by proving at the trial what sum would have been raised, and what part thereof would have been payable to him, had the tax been levied. Nor do we perceive that the remedy in equity is any more efficacious than at law. All that a court of equity can do is to determine the validity of the obligations, and render a money decree for the amount of the annual installments then due and unpaid. As much can be done by a court of law, and with equal facility. Moreover, after the validity of the obligations has been established, and a judgment obtained, resort must then be had to a legal remedy, to wit, a writ of mandamus, to compel the levy of a tax to pay the judgment, whether it be recovered at law or in equity, since it is a well-settled doctrine in the federal courts that a court of equity cannot command the levy of a tax; that being a duty which the legislature must impose; the sole function of the courts being to enforce its performance by mandamus when it has been imposed. Heine v. Levee Com'rs, 86 U. S. 655, 22 L. Ed. 223; Rees v. City of Watertown, 86 U. S. 107, 22 L. Ed. 72; Stryker v. Board, 23 C. C. A. 286, 292, 77 Fed. 567. The argument in support of the right of the bondholders to unite and sue in equity on all of the obligations, in its last analysis, results in this proposition: That whenever several persons have distinct or several demands against the same person or corporation, growing out of contract, they may, for the purpose of avoiding a multiplicity of suits, unite and sue in equity to enforce the payment thereof, provided their several demands were incurred by the defendant at the same time and in the same manner, and provided that the defendant interposes or threatens to interpose the same defense thereto. This proposition, in our judgment, is not sustained by any well-considered decision. In the case of Osborne v. Railroad Co. (C. C.) 43 Fed. 824, it appeared that the title of numerous owners of land, who held the same in severalty, and who were also in possession of their respective tracts, was clouded by a claim to all the land which was preferred by a railway company under its land grant; and it was held by Mr. Justice Harlan, on the circuit, that the several landowners might unite in a bill against the railroad company to remove the common cloud, and have the claim adjudged to be invalid. It will be noted that in this case equity had jurisdiction for other reasons than to avoid a multiplicity of actions; this latter ground having been adverted to not as the sole reason for affording relief in equity, but merely to uphold the right of the complainants to file a joint bill, and to avoid

the charge that the bill was multifarious. On the other hand, in the case of Heine v. Levee Com'rs, 86 U. S. 655, 22 L. Ed. 223, several bondholders, whose bonds had been issued at the same time and under the same circumstances by a board of levee commissioners, united in filing a bill in chancery to obtain a decree for the amount of the bonds, and to compel a levy of taxes to satisfy the decree. It was held that a court of chancery had no jurisdiction of the case unless there was some obstruction in the way of the common-law remedy, and it was not even suggested by court or counsel that, because a suit in chancery would lessen the number of actions, such a proceeding could for that reason alone be maintained, although the bonds sued upon did originate in the same transaction, and although the defenses thereto were the same, and the same questions of law and fact would be involved in the trial. It was said, in substance, that the appropriate remedy was in a court of law, the causes of action being of legal cognizance. It is obvious that, if the proposition contended for by the complainants in the equity case is tenable, then the holders of municipal bonds may always unite and sue in equity if the municipality repudiates its obligations, on the pretense that by so doing a multiplicity of suits will be avoided. Such a practice, however, has never obtained or been attempted, although actions upon such bonds have been very numerous, except in the instance above cited, where the jurisdiction in equity was emphatically denied. As bearing incidentally on the point now under consideration, it may be further observed that in several cases before the supreme court where the question of jurisdiction, in view of the amount in controversy, was involved, that court has inferentially recognized the right of several persons having distinct interests to unite in an appeal on grounds of convenience, provided their rights or liabilities grow out of the same transaction and give rise to the same questions. But in such cases litigants have never been permitted to aggregate their claims for the purpose of making up the amount necessary to confer jurisdiction unless they were able to show a common and undivided interest in the subject-matter of the litigation. Clay v. Field, 138 U. S. 464, 11 Sup. Ct. 419, 34 L. Ed. 1044; Hawley v. Fairbanks, 108 U. S. 543, 548, 2 Sup. Ct. 846, 27 L. Ed. 820; Ex parte Baltimore & O. R. Co., 106 U. S. 5, 1 Sup. Ct. 35, 27 L. Ed. 78. See, also, a late case, Wheless v. City of St. Louis, 180 U. S. 379, 21 Sup. Ct. 402, 45 L. Ed. 583, affirming the carefully considered decision of the circuit court in the same case. Vide 96 Fed. 865. Persons holding distinct claims arising out of contract, which may be reduced to judgment at law without difficulty, should not be allowed to aggregate them and sue in equity, even if they do grow out of the same transaction and involve the same questions, and even though a multiplicity of actions would thereby be avoided. If such a practice was tolerated, the boundaries of the jurisdiction of courts of law and equity would soon become confused or obliterated.

The result is that the bill in the equity case was properly dismissed for want of jurisdiction in equity, but such dismissal should have been without prejudice to the complainants' right to sue at law.

For the reasons already stated, the judgment in the law case, although it was for the right party, cannot be sustained, because the recovery was excessive. It is accordingly ordered that the judgment in the law case be reversed, and the cause remanded for a new trial, and that the decree in the equity case be modified by adding thereto a clause that the dismissal is without prejudice to the complainants' right to sue at law, and that as thus modified, the decree be affirmed.

SANBORN, Circuit Judge (dissenting). I concur in the views expressed in the foregoing opinion, upon every question except that relating to the right of the complainants to maintain a suit in equity. It seems to me that they have that right, and for the following reasons:

This bill in equity is brought by 26 different parties, each of whom is the separate owner of certain specific bonds. They allege in their bill the terms of the bonds, the vote to issue them, the construction of the railroad, the subsequent delivery of the bonds, and their purchase of their respective holdings. They aver that the indebtedness of the county upon each bond is $1,210; that the county has collected and now has in its treasury $3,059.16, which it has obtained by the levy and collection of taxes to pay these bonds, and that it has refused to pay over this fund, or to make any further levies of taxes to satisfy the indebtedness evidenced by their obligations; and that they have sustained damages in the amount of $1,210 upon each bond by the acts of the defendant. They pray that the fund in the county treasury derived from the levy and collection of the taxes to pay their securities be paid over to them as their respective interests may appear; that the proper officers of the county be directed to make a levy annually of one mill on the dollar on the taxable property of the county to pay the bonds; and they ask for general relief. A glance at the bond discloses the fact that it contains no promise to pay any sum certain at any certain time, and that the only agreement in it is, in effect, that it will pay to each bondholder his pro rata share of such an amount as shall be raised annually by the levy of one mill upon a dollar upon the taxable property of the county. It is a promise to raise and pay over a share of a fund,—nothing more and nothing less. Bearing in mind the nature of this obligation, let us consider the objections to the maintenance of this suit in equity. The contention that distinct demands or liabilities cannot be aggregated for the purpose of giving the circuit court jurisdiction (Clay v. Field, 138 U. S. 464, 480, 11 Sup. Ct. 419, 34 L. Ed. 1044; Hawley v. Fairbanks, 108 U. S. 543, 548, 2 Sup. Ct. 846, 27 L. Ed. 820; Ex parte Baltimore & O. R. Co., 106 U. S. 5, 1 Sup. Ct. 35, 27 L. Ed. 78; Wheless v. City of St. Louis, 180 U. S. 379, 21 Sup. Ct. 402, 45 L. Ed. 583) has no relevancy to this case, because the complainant first named in the bill owns 18 bonds, evidencing an indebtedness of $21,780; and there is no more reason to suppose that his claim to recover this amount in this suit in equity was made in bad faith, than there is to suppose that the claim of Williams in the action

at law to recover the entire debt evidenced by his bonds was made in bad faith. Moreover, the amount in controversy in the equity suit is not the aggregate amount which the levy of one mill on a dollar for the years 1898 and 1899 would produce and render applicable to the payment of these bonds. On the other hand, it is the entire debt which they evidence, because a decree in this suit that the issue of the bonds was unauthorized, and that the complainants are entitled to no levy to pay them, will necessarily render every part of them void, and will constitute a perpetual bar to any subsequent suit to collect any unpaid portion of them. The amount in controversy, therefore, between the complainant Blair alone and the defendant, was far more than sufficient to confer jurisdiction upon the court below.

Turning to the general question whether or not a court of equity has jurisdiction of the case made by this bill, there are three grounds which warrant the maintenance of this suit:

1. The owners of separate claims and rights of action against the same party may maintain a single suit against him "where a number of persons have separate and individual claims and rights of action against the same party, but all arise from some common cause, are governed by the same legal rule, and involve similar facts, and the whole matter might be settled in a single suit brought by all these persons uniting as coplaintiffs, or one of the persons suing on behalf of the others, or even by one person suing for himself alone." 1 Pom. Eq. Jur. §§ 245, 255, 257, 268, 269, 273; Crews v. Burcham, 66 U. S. 352, 357, 17 L. Ed. 91; Osborne v. Railroad Co. (C. C.) 43 Fed. 824, 828. There is no fatal misjoinder of causes of action in equity in any bill which presents a common point of litigation, the decision of which will affect the whole subject-matter, and will settle the rights of all the parties to the suit. Kelley v. Boettcher, 29 C. C. A. 14, 23, 85 Fed. 55, 64, 56 U. S. App. 363, 378; Hayden v. Thompson, 17 C. C. A. 592, 598, 71 Fed. 60, 67, 36 U. S. App. 361, 369; Chaffin v. Hull (C. C.) 39 Fed. 887; Brinkerhoff v. Brown, 6 Johns. Ch. 139; Fellows v. Fellows, 4 Cow. 682, 700; Prentice v. Forwarding Co., 7 C. C. A. 293, 296, 58 Fed. 437, 441, 19 U. S. App. 100, 108; Brown v. Safe Deposit Co., 128 U. S. 403, 412, 9 Sup. Ct. 127, 32 L. Ed. 468. There is a common point of litigation between the complainants and the defendant in this suit. Indeed, the only point of litigation is a common one. It involves the question whether or not the sole defense to these bonds is good,—whether or not their issue was authorized by the statutes of Nebraska. If this defense is good against one, it is good against all the complainants; and, if it is bad against one, it is bad against all. The complainants' rights and causes of action arise from a common source,—from the act of the county in issuing the bonds. They involve similar facts. They are governed by the same legal rules, and a single decision in this single suit between them and the county will determine all the rights of the parties in interest, and will settle the entire matter in litigation. A decree in this suit that the issue of these bonds was unauthorized will bar all farther actions or suits upon them, and a decree that

they were lawfully issued will perpetually estop the defendant from defeating them. The case falls far within the familiar rule which has been quoted from Pomeroy.

2. Equity has jurisdiction of suits to execute trusts and to administer and distribute trust funds. This is a suit for that purpose. The $3,059.16 which the defendant has collected and placed in the hands of its treasurer by means of the levy of the tax to pay these bonds required by the statute is charged by the law with a trust for the benefit of the complainants. Neither the county nor the taxpayers nor any other party has any right to this money. The treasurer holds it in trust for the complainants, and any one or more of them has the right to institute and maintain a suit in equity, against this trustee and all the other holders of bonds who claim a share in it, to ascertain the respective rights of the claimants therein, to compel the execution of the trust and the distribution of the money. Insurance Co. v. Mead (S. D.) 82 N. W. 78, 82. This is one of the objects of this suit, and this alone is sufficient to sustain the jurisdiction of the court, and, having thus obtained jurisdiction, to warrant it in proceeding to determine the rights of these parties in the entire subject of this litigation.

3. The complainants are without any adequate remedy at law. The remedy at law which will preclude the maintenance of a suit in equity must be "plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." Boyce v. Grundy, 28 U. S. 210, 215, 7 L. Ed. 655; Oelricks v. Spain, 82 U. S. 211, 221, 223, 21 L. Ed. 43; Preteca v. Land Grant Co., 1 C. C. A. 607, 50 Fed. 674, 4 U. S. App. 326; Foltz v. Railroad Co., 8 C. C. A. 635, 641, 60 Fed. 316, 322, 19 U. S. App. 576, 587; Hayden v. Thompson, 17 C. C. A. 592, 594, 71 Fed. 61, 63, 36 U. S. App. 361, 367. There are 26 complainants in this suit. Would 26 actions at law be as efficient, as practical, and as prompt to attain the ends of justice, as this suit in equity? These bonds, as we have seen, contain no promise to pay any sum certain at any certain time. They are mere acknowledgments of indebtedness, and agreements to levy a tax and to distribute the proceeds pro rata among the bondholders. All the bondholders are necessary parties to the distribution by any court of the proceeds of any tax that may be levied, because no court can so determine the pro rata share of any bondholder that its decision will bind the other bondholders, and protect the county from excessive payments, unless the other bondholders are parties to the suit. They cannot be made parties to an action at law. Nor is there any way in which the amount for which a judgment at law in favor of any bondholder should be rendered can be definitely ascertained. The sum he is entitled to recover in an action at law is his pro rata share of the amount which a tax of one mill on a dollar on all the taxable property of the county would have produced in the years 1898 and 1899 if it had been levied and collected. It may be possible to determine what amount should have been levied, but how can the amount that would have been collected if the levy had been made in 1899 be found in an action

at law? And how. can the pro rata share of a plaintiff be so adjudged that the decision will bind the other bondholders, and protect the county from excessive payments? These questions may present themselves for answer in 26 actions at law, followed by 26 proceedings by mandamus, .before the complainants will secure any relief, if they are forbidden access to a court of equity. Proceedings of that character will fall far short of this simple suit in equity in efficiency, practicability, and promptitude. All the bondholders are or may be made parties to this suit. A single decree here may adjudge the validity of the bonds, the number of bonds held by each claimant, the amount owing to each claimant thereon, and his percentage of the trust fund now in the hands of the treasurer of the county, and of the proceeds of any tax levies that may hereafter be made. Such a decree would bind all the parties interested in this litigation, and put an end to the controversy. The defendant would then undoubtedly proceed to levy the tax and pay the bonds according to their terms, and, if it did not, such a decree would be as ample a warrant for the necessary proceedings by mandamus as any judgment at law can be. This suit in equity is a far more simple and effective way to attain the ends of justice in this matter than any actions at law can be. The bill is an application for the administration and distribution of a trust fund, and it presents a case where a number of persons have separate and individual claims and rights of action against the same party, which arise from a common source, which involve a common point of litigation, and which can all be settled by a single decision in a single suit.

For these reasons, it appears to me that a court of equity has jurisdiction of this suit, that the judgment sustaining the demurrer to the bill ought to be reversed, and that the suit should be sustained.