157 N.J. Super. 173 (1978)
384 A.2d 859
LESLIE BLAU CO., A DIVISION OF BLAU MORTGAGE CO., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT,
v.
DOMINICK ALFIERI ET AL., DEFENDANTS-APPELLANTS, AND RAYMOND E. REITMAN ET AL., CALI ASSOCIATES ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 1977.
Decided February 28, 1978.
*177 Before Judges ALLCORN, MORGAN and HORN.
Mr. Irwin I. Kimmelman argued the cause for appellants (Messrs. Kimmelman, Lieb, Wolff & Samson, attorneys; Mr. Ronald E. Wiss on the brief).
Mr. Jerome C. Eisenberg argued the cause for respondent Leslie Blau Co. (Messrs. Clapp & Eisenberg, attorneys; Mr. Jeffrey W. Lorell on the brief).
*178 Mr. Richard E. Brennan argued the cause for respondents Raymond E. Reitman et al. (Messrs. Shanley & Fisher, attorneys).
Mr. Joseph C. Nuzzo argued the cause for respondents Cali Associates et al. (Messrs. Nuzzo, Nuzzo & Buchanan, attorneys).
The opinion of the court was delivered by HORN, J.A.D.
Plaintiff, a licensed real estate broker, sued for and recovered at the hands of a jury a judgment in the sum of $291,900 (later amended to $346,473.25 to reflect the addition of prejudgment interest) in this action predicated upon the theory that one or all of defendants tortiously interfered with its prospective advantage as a real estate broker.
Defendants named in the action, which was filed in January 1974, were Raymond E. Reitman, individually, and three corporations apparently controlled by him (the Reitman defendants); Angelo Cali together with certain named individuals and a corporation controlled by them (the Cali defendants); and Dominick Alfieri, individually, and M. Alfieri Co., Inc., a corporation (Alfieri Co.), together with others (the Alfieri defendants).
Each group of defendants answered plaintiff's complaint and crossclaimed for contribution and indemnification against the others. All defendants moved for summary judgment in their favor on the ground that they could not, as a matter of law, be responsible for real estate brokerage commissions on the facts presented. On February 17, 1976 the judge entered an order granting summary judgment only for the Reitman defendants, thereby dismissing the complaint and all crossclaims against them with prejudice. Application for leave to appeal by the Alfieri and Cali defendants was denied by us. The case proceeded to trial against the Alfieri and Cali defendants for eight days during the latter part of March and early part of April 1976. The jury returned the *179 stated verdict for plaintiff against the Alfieri defendants, only,[1] which verdict was molded to the sum of $291,900.[2] The jury's verdict exonerated the Cali defendants. The Alfieri defendants unsuccessfully moved for a new trial on the ground that the verdicts were against the weight of the evidence and for judgment n.o.v. On June 28, 1976 the Alfieri defendants filed their notice of appeal from the judgment entered against them in favor of plaintiff and the judgment entered in favor of the Cali defendants, and from the summary judgment in favor of the Reitman defendants.
Plaintiff, as a licensed real estate broker, was at all times before and during the history of this litigation in the real estate business, specializing in industrial real estate brokerage, including factory sites, warehouse sites and industrial buildings. Before 1972 plaintiff had sold land to and for the Reitman defendants both in Newark and Camden. These defendants operated a wholesale liquor business under two names  Galsworthy, Inc. and Reitman Industries  and a real estate business under the name of Rockingham Realty. The principal figure of the Reitman defendants was defendant Raymond E. Reitman. Plaintiff's representatives in the transactions leading to this litigation were Theodore E. Stein and Bernard Zimmel.
For many years before 1968 the Reitman defendants' head-quarters, including their warehouse, were located on Frelinghuysen Avenue in Newark, in premises originally located for them by plaintiff. In 1968, wishing to expand, they gave plaintiff Blau an assignment to find a new location for them  either a new warehouse and office building or land *180 upon which they could construct a new building. Although at first Reitman was interested in relocating to Middlesex or northern Union County, by 1972 his interest was narrowed to the West Essex County area. Blau undertook to find suitable land within the perimeter of the West Essex County area drawn by Reitman on a map which Reitman gave to Stein and Zimmel. By the summer of 1972, after the inspection of numerous properties suggested by plaintiff, Reitman's interest focused on an approximately 44-acre unimproved tract of land identified as Essex-Passaic Industrial Park in West Caldwell, which had been among those suggested by Stein. Reitman asked Stein for more information on the property.
Extensive investigation of the details of this property was conducted by plaintiff in the fall of 1972. The property was owned by Cali Well-Cald Associates, a partnership named as part of the Cali group of defendants. Negotiations looking toward a sale of all or part of the tract commenced in December 1972 between Angelo Cali and "Iggy" Seminara, both experienced builders and developers, as the active principals for the sellers, and Reitman and David Lowenstein, a vice-president of Galsworthy, Inc., for the Reitman defendants, as a result of plaintiff's bringing the parties together. Stein and Zimmel participated in these negotiations on behalf of plaintiff.
Initially Reitman, who acted for the Reitman defendants, was interested in buying 11 to 15 acres or in having Cali build the desired improvements and lease them back to Reitman with an option to purchase. Plaintiff arranged a meeting between Cali and Reitman on December 13, 1972. At this meeting Cali offered to sell the entire tract of approximately 40 acres, but the offer was rejected since the Reitman defendants were only interested in acquiring sufficient acreage to accommodate the construction of their proposed warehouse and offices. Cali quoted a price of $42,500 an acre net after commissions and told Stein that the price would be increased by whatever amount the broker was to be paid as commission.
*181 With the statute of frauds (N.J.S.A. 25:1-9) in mind, on December 7, 1972 Blau wrote a letter to Cali confirming the December 13, 1972 meeting, which letter in part stated:
These people [Reitman defendants] have inspected the acreage which you own at the above captioned property and are interested in discussing the possibilities of acquiring a site suitable for a distribution center with an initial building of 150,000 sq. ft. and ultimate expansion to 200,000 sq. ft. They have inspected this site on several occasions with us and would now like to get together with you to see whether or not a satisfactory size piece can be purchased at a mutually agreeable price.
For the record, we wish to advise you that if you complete a sale of your property at the above address to the aforementioned companys [sic] or any individuals representing them, or to any company affiliated with said companys [sic], you will be obliged to pay us a commission equal to 10% of the purchase price.
While they are not primarily interested in having a building built to suit on a lease basis, in the event some such arrangement develops you will be obligated to pay us a commission equal to 5% of the total aggregate rental on the terms of any lease as well as any option, renewal, or extension periods as well as for the rental for any additional area constructed.
After that meeting Blau again wrote to Cali. Pertinently this letter stated:
Mr. Ray Reitman and his associates advised us that they were very anxious to secure from you as soon as possible the various proposals and avenues for working up a deal that were explored and discussed at the meeting. We are anxious, therefore, for you to come up with proposals for the outright purchase of twelve to fifteen acres, the possible erection of a building built to suit using the specifications which were given to you by Mr. Reitman. Such a building would be built on the basis of a long-term lease with an option to buy. There are also the possibilities for the construction by you of a building on a suitable site which would be sold by you upon completion. The fourth possibility of course was the outright purchase of your entire property.
As per our previous letter of December 7, please be advised for the record that you will be obligated to pay us a commission equal to 10% of the selling price for any acreage sold to the above captioned companies, or any individuals representing it, or to any company affiliated with said companies.
*182 In the case of a lease, you will be obligated to pay us a commission equal to 5% of the total aggregate rental for the term of the lease and any options, renewals, extensions or revisions thereof, as well as any additions which might be added to the building in the future.
In the case of an outright sale of a building which you would construct, the commission would be equal to 5% of the total selling price.
Reitman had not decided whether he wanted to purchase the land, wanted Cali to construct a building to lease to him or wanted to combine a short-term lease with an option to purchase. Therefore, on January 5, 1973, the Cali defendants submitted a number of proposals to Reitman in an effort to crystalize the purchaser's thoughts about the property. Cali prepared drawings of possible buildings which could be built on the property, and he provided alternative financial arrangements, such as sale of land, sale of land and buildings, lease with an option to buy, etc. Reitman remained indecisive as to how to proceed. On February 22 representatives of Cali, Reitman and Blau met at the office of David Mandelbaum, the attorney engaged by Reitman, to discuss the possible transaction. Although Reitman objected to Cali's price as being too high, that is, approximately $42,500 an acre net to the Cali defendants, some tentative agreement was reached for the Reitman defendants to purchase a portion of the Cali defendants' property. The transaction was to be solely a purchase of land, because Reitman planned at that time to undertake his own construction of the warehouse and office complex.
The total price that Reitman had orally agreed to pay for the land at the February 22 meeting was about $675,000, depending on the final number of acres multiplied by the gross $47,500 an acre price. This amount included a brokerage commission for Blau of $67,500. In addition, Reitman also agreed, as part of the brokerage commission in his purchase of the Cali property, to give Blau exclusive contracts to sell the two Reitman properties in Newark which would be vacated upon the move to West Caldwell.
*183 Between February 22 and March 1, 1973 Reitman had changed his mind as to purchasing the property and had decided on a long-term lease alternative. On or about March 1, 1973 David Mandelbaum, Reitman's attorney, went to Cali's home and informed him of this decision. Reitman then retained an architect to draw plans for the building that he wanted on the property and to get competitive bids indicating what the construction cost would be and what the rental price would be. Mandelbaum and Cali discussed these developments and agreed that Reitman could put the building up for competitive bids and that Cali would be included as one of the bidders, but also that Cali would be given the "last look," or the opportunity to meet the other bids, so as to insure him the right to build. No binding agreement of any kind was executed between any of the Cali or the Reitman defendants.
By April 1, 1973 the architect's plan had been completed and forwarded to Cali and three independent builders, all prospective landlords, with a request for a per square foot rental figure on a long-term net lease to Reitman. All bidders were told to assume a purchase price for the land and to include a commission for Blau in the amount of $67,500. All bids were received by the third week in April 1973.
In the meantime Reitman and Cali had jointly applied to the planning board of West Caldwell to obtain approval of Reitman's intended use of the property. Reitman and Seminara appeared before the board between March 12 and April 3, 1973 for this purpose, and use approval was granted on April 4, 1973. When the bids came in the Siegler Construction Company bid of $1.49 a square foot was the lowest. Cali's bid was $1.70 a square foot. A meeting between Reitman and Cali was scheduled for May 3, 1973 to review the bids, inasmuch as Cali had the "last look." Suddenly, however, at the beginning of May the Cali-Reitman deal came to an abrupt halt; Blau and Reitman learned accidentally that Alfieri had acquired the subject land. Actually, Cali through Alfieri had entered into an agreement of sale with *184 a nominee of Alfieri, Creston Realty, Inc., on April 18, 1973, subject to a contingency made dependent on what test borings would disclose.
It appears that Alfieri and Cali had met and discussed the property beginning in January or February 1973, and by March 16, 1973 they had reached a meeting of the minds that Alfieri would purchase the entire property from Cali for $44,696 an acre.[3] The purchase contract between Alfieri and Cali was kept secret from both Blau and Reitman. When Mandelbaum and Zimmel learned of the Alfieri purchase, Seminara at first denied that the property had been sold to Alfieri. On April 25, 1973, even after Cali had executed the contract for the sale of the property to Alfieri, Cali submitted a bid in his own name to build and lease to Reitman. This bid of $1.70 a square foot had been supplied to Cali by Alfieri.
When plaintiff and Reitman learned of the sale to Alfieri they cancelled a meeting scheduled with Cali for May 3, 1973. Mandelbaum then asked Alfieri to meet with Reitman and him at Reitman's office on May 4, 1973.[4] This meeting was attended by Reitman, Alfieri, Stein, Mandelbaum and Lowenstein. A long-term lease to Reitman was discussed. Alfieri refused to recognize plaintiff as a broker or to pay any commission, notwithstanding Reitman's contention that since Alfieri's bid and price with respect to the lease was that originally submitted by Cali and was to include a commission, it should be paid by Alfieri. Subsequently, a 20-year lease was negotiated between said Creston Associates and Galsworthy, Inc., one of the Reitman defendants, which did not provide for the payment of any commission. Additional *185 pertinent facts will be mentioned in conjunction with a discussion of the specific arguments.
Unfortunately there was no pretrial conference in this fairly complicated case and, as a result, although extensive depositions and other discovery had taken place in advance of the trial, the issues and claims were not as well defined as they might otherwise have been.
At oral argument counsel for the Alfieri defendants candidly conceded that the jury could have properly found a verdict against them on the thesis advanced by plaintiff. He asserted, however, that prejudicial errors committed by the trial judge so tainted the verdict that they are entitled to the relief sought. Before proceeding to a consideration of the alleged errors we need to refer to the nature of the tort for which plaintiff sought to recover.
The law not only protects one from unjustifiable interference with one's contract by another but it also protects a person's interest in reasonable expectation of economic advantage. Harris v. Perl, 41 N.J. 455, 462 (1964); Mayflower Industries v. Thor Corp., 15 N.J. Super. 337, 339 (Ch. Div. 1951), aff'd o.b. 9 N.J. 605 (1952). One who unlawfully interferes with that interest will be held liable for the damage sustained by the victim of that interference. Mayflower Industries v. Thor Corp., supra at 339. Accordingly, the right to pursue the real estate brokerage business is one of the property rights or interests which the law protects against unlawful interference. Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E. & A. 1934). If unlawful means are employed, such as fraud or intimidation, or if the means consist of acting without justifiable cause (malice) so that a person suffers injury to his business, he may secure redress for his damage. McCue v. Deppert, 21 N.J. Super. 591 (App. Div. 1952). There must be proof not only of the unlawful, intentional interference with the prospect of reasonable expectation of economic advantage, but also proof that if there had been no interference there was a reasonable probability that the victim of the interference *186 would have received the anticipated economic benefits. Myers v. Arcadio, Inc., 73 N.J. Super. 493, 498 (App. Div. 1962).
As stated in Sustick v. Slatina, 48 N.J. Super. 134 (App. Div. 1957):
In this area of the law the use of such expressions as conspire, unlawful, malicious, etc., has been criticized as beclouding judgment and clear thinking in the formulation of rules of liability. See Weinstein v. Clementsen, 20 N.J. Super. 367, 371 (App. Div. 1952). Yet a degree of generality in the criteria which will suffice to spell out liability in any given case of this kind is unavoidable. The essence of the cases in this field is that in adjudging whether what the defendant has done is actionable, i.e., not done in the exercise of an equal or superior right, the ultimate inquiry is whether the conduct was "both injurious and transgressive of generally accepted standards of common morality or of law." Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 255 (App. Div. 1957). In other words, was the interference by defendant "sanctioned by the `rules of the game.'" 1 Harper and James [Torts], op. cit. supra, § 6.11, p. 510 [1956]; cf. Trautwein v. Harbourt, 40 N.J. Super. 247, 267, 268 (App. Div. 1956). There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances. Not only must defendants' motive and purpose be proper but so also must the means. Louis Kamm, Inc., v. Flink, supra (113 N.J.L., at p. 589). [at 144]
Of course the law affords protection of a business entrepreneur only as against wrongful acts of third persons  not against fair and legitimate competition. McCann v. Biss, 65 N.J. 301 (1974); George F. Hewson Co. v. Hopper, 130 N.J.L. 525 (E. & A. 1943); Sustick v. Slatina, supra; Weinstein v. Clementsen, supra. See also, Ass'n Group Life, Inc. v. Catholic War Veterans, 120 N.J. Super. 85, 98 (App. Div. 1971), mod. 61 N.J. 150 (1972).
We are satisfied in the light of the foregoing that the trial judge properly submitted to the jury the issue of whether the Cali defendants or the Alfieri defendants, or both, unjustifiably interfered with plaintiff's reasonable expectation of compensation for its services as a broker.
*187 Neither our own endeavors nor those of counsel have produced any case with a similar factual pattern. All of the successful brokerage commission tortious-interference cases in our own State follow a pattern whereby one of the parties to a sale has by fraud, deceit or subterfuge endeavored to escape payment of commissions on sales of real estate. The instant case presents a novel factual pattern. But each case must be decided upon individual facts. Myers v. Arcadio, Inc., supra. As stated by Judge Conford for the court in Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244 (App. Div. 1957):
* * * The novelty of a specific occasion for application of a principle in this field is no reason for according it a chilly reception. [Citation omitted.] What is called for is a reasonable accommodation within the framework of the remedial principle of claims for relief against behavior which is both injurious and transgressive of generally accepted standards of common morality or of law. [Citation omitted.] * * *
The very nature of the tort prohibits a "rule of thumb" in every case. 1 Harper and James, Law of Torts, § 6.12 at 515 (1956). But where it appears to the judge, as in this case, from sufficient facts and the legitimate inferences therefrom, that the elements of the tort may be present, including conduct which was both injurious and transgressive of generally accepted standards of common morality or of law, it is then for the jury or the fact finder to decide the issue. Cf. Myers v. Arcadio, supra 73 N.J. Super. at 499.
Harris v. Perl, supra, particularly supports our view. In that case plaintiff, a licensed real estate broker, sought damages from, among others, her prospective purchasers of a residential property, under the theory that the latter had tortiously interfered with plaintiff's reasonable expectation of economic advantage. In upholding recovery, the court determined that defendants did not observe the rules of "fair play," because when they learned that Cronin, the owner, had transferred title to a bank during negotiations, said *188 "fair play would require a prospective purchaser to permit the broker to seek recognition by the owner, unenticed by the purchaser's offer to deal directly." (41 N.J. at 464).
In the instant case the contention that a broker takes his chances on whether his efforts result in the consummation of a sale or lease and that he "wins some and loses some" is beside the point. Nor is the contention that the Cali defendants and the Alfieri defendants, and in fact all the participants in the scene, were professionals a valid reason for a court's condoning sharp dealing.
What did the Alfieri defendants do to make them liable? The jury could have found that they procured the Cali defendants to continue to act as the owner of the land when in fact the latter no longer were the decision makers. Alfieri even decided the amount of rental under the lease (which included a commission) Cali was to have discussed with Reitman on May 3, 1973. They remained silent when they should have spoken. They permitted plaintiff as well as Reitman to perform as if the contemplated negotiations were progressing to a finality. They conspired to hold Reitman (and plaintiff) in limbo until they were ready to announce the new ownership and, in the meantime, to neutralize plaintiff from attempting to persuade its clients, the Reitman defendants, to look elsewhere for an appropriate site  a site whose owner would pay commissions for plaintiff's services.
As a professional developer Alfieri learned from Cali that plaintiff was the procuring broker and was to be paid by Cali. Since the Alfieri defendants bought with the expectation of Reitman's lease being consummated, they wanted no one to "rock the boat."[5] They realized that as time went on Reitman was becoming more anxious to finalize the lease.
*189 The fact that the Alfieri defendants stood to gain if they could avoid the payment of commissions is not relevant in this case. The motive of such a tortfeasor is relevant only to determine whether he acted out of sheer malice. If the alleged tortfeasor acted out of sheer malice, he will be liable on that account. If he acted out of a motivation to enhance his financial position  for profit, then it is necessary for recovery that his conduct must have been transgressive of generally accepted standards of morality, i.e., a violation of standards of "socially acceptable conduct." 1 Harper and James, op. cit., § 6.11, at 511, 513-514; Prosser on Torts, at 978 (1964). The instant case was submitted to the jury on the thesis that the Alfieri group sought to profit by their perfidy, so that recovery against them required a finding by the jury that their conduct violated the accepted standards of morality.
The tort is not founded on a quantum meruit or quasi-contract thesis. Unjust enrichment of the tortfeasor is not an element of the tort. But such enrichment is a consideration not alone in connection with whether, as stated, a defendant's conduct was initiated out of sheer malice, but also in determining whether the moral standards have been violated. In Harris v. Perl, supra, the court said:
And so here, when the Perls accepted plaintiff's services, it was with the obligation which all decent men would recognize, that they would not line their purse with the money value of those services. It is of no moment that Cronin was not the agent of the bank and hence plaintiff had no authorization from the record owner. That fact provided an opportunity for overreaching rather than a justification for it. As we pointed out above, the law protects not only contracts but also the reasonable expectations of economic gain. In these circumstances fair play would require a prospective purchaser to permit the broker to seek recognition by the owner, unenticed by the purchaser's offer to deal directly. As we have already said, we have no doubt the bank would have dealt with plaintiff, but the Perls did not give her that opportunity. More than that, Perl lured plaintiff from stumbling upon the truth by deceitfully saying he would discuss the sale after the Labor Day weekend. [41 N.J. at 464]
*190 A jury could have deduced that when the attempt to hide the Alfieri defendants' interest until they were ready to disclose it was thwarted by the accidental discovery of a rig on the land, then Alfieri learned two things from the almost immediate call from Mandelbaum for a meeting  first, he could increase the rental to be charged by five cents a square foot and, second, Reitman's anxiety indicated he could even make the deal with Reitman without a payment of commission to Blau.
There is one final observation on this point. If Cali had entered into the lease with Reitman before the title passed to the Alfieri defendants, there was no doubt that plaintiff was legally entitled to a commission. Yet under the circumstances it was plain that Alfieri was working toward such a lease. However, instead of that, Alfieri's company (which had not yet acquired title to the land) continued with the negotiations on May 4, 1973 and thereafter, and executed the lease (escrowed until title to Creston Associates passed).
We suspect that our dissenting colleague differs from our view as to the liability of the Alfieri group for several reasons which we deem to be incorrect. First, her concept of the tort which is applicable here is overly restrictive. We acknowledge that this tort is not as well defined as some other torts  probably because recovery in part depends upon whether a jury may conceive that defendant has not acted "according to the rules of the game." But her approach appears to us to be too legalistic and founded upon the proposition that since she regarded Alfieri as a competitor of Reitman, his actions were not to be fettered by concepts of morality. But the law is to the contrary, as already noted.
Our colleague ignores a most important inference from the facts which the jury detected from the circumstances  Alfieri's conduct was dictated by the probability of Reitman's ultimate consummation of a lease and, with the passage of time, his increasing anxiety to relocate the site of his business operations. Instead of this theme she regards *191 his actions in the cold legalistic light that Alfieri bought with no guarantee of (and her personal belief that it was irrespective of) Reitman's very obvious desire to enter into a lease.
The facts permitted a jury to conclude that Alfieri knew almost from his original associations with Cali what Reitman was doing and planning, first, as to the purchase of the land and, second, as to entering into a lease. Also the jury could conclude that Alfieri's negotiations with Cali were either dictated by or were reactions to what he learned from Cali as to the course of Reitman's negotiations with Cali. As noted, Alfieri learned of the availability of the tract of land about the beginning of January. Not until after Reitman indicated his serious interest in negotiating a lease did Alfieri decide to buy the land on March 16, 1973.
But when he did decide to buy he cautiously waited until April 18, over a month later, before entering into a written agreement  prior to which he had no obligation to purchase. Even after the agreement of sale from Cali to Alfieri was executed on April 18, 1973, Alfieri had for 21 days (to May 9, 1973) a right to withdraw from the agreement with impunity, on a claim that the soil tests were unsatisfactory for his purposes. Alfieri, both before and after April 18, 1973, using Cali as his negotiator, prepared the lease terms for the proposed lease with Reitman, including the amount of the rent, which purported to include plaintiff's commission. He intended to continue this charade to the point where the lease was about to be executed and then to announce his ownership and willingness to execute the lease  without payment of commissions.
Contrary to our colleague's belief, which obviously differs from the legitimate inference that the jury drew, Alfieri was secretive all through this, and enlisted Cali's cooperation in his plan. There is no indication whose soil-testing rig was on the premises when accidentally discovered by Zimmel  but except for that fortuitous observation this fiction would have continued on until, as stated, Alfieri was *192 ready for the denouement. By that time Reitman would have been in a tight spot. Alfieri calculated that at that time Reitman would proceed even if it meant he paid the commissions himself, but in any event Alfieri, as a stranger to plaintiff, would not be responsible for commissions.
All through this playacting  as far back as January 1973  plaintiff continued to act as broker and continued to expect to be compensated for its services. In effect, the jury deduced that in the totality of the circumstances Alfieri's conduct was not that of a competitor, it was that of a predator  that Alfieri's agreement to buy (first oral and then graphic) was not, as our colleague believes, the act of a fair competitor which terminated plaintiff's right to commissions, but was only an event in a master plan to achieve a profitable lease without an obligation to pay plaintiff, whose work made it all possible.
It may be rightfully assumed that ordinarily two land developers competing for the purchase of the same tract of land need not disclose their respective interests to each other. But in the instant case Alfieri and Reitman ceased being competitors for the same tract about the last week of February 1973, when Cali told Alfieri that Reitman no longer wanted to merely buy the land but wanted something entirely different  a long-term lease with options to purchase at different intervals.
Our colleague is correct in saying that Alfieri had no assurance of Reitman's making a lease when he entered into the formal contract to buy the land on April 18, 1973 (with the release clause, as mentioned). But as stated in Jersey City Printing Co. v. Cassidy, 63 N.J. Eq. 759, 765 (Ch. 1902): "A large part of what is most valuable in modern life seems to depend more or less directly upon `probable expectancies.' * * *"
Harper and James, op. cit., at 518, elaborated on this theme of competition (although, as stated, we do not regard Alfieri as being a competitor of Reitman). They said:
*193 The bounds of the privilege of competition may be described as limited by the actor's intention and by the character of the practices which he employs. Stated in other words, competition in trade, business or occupation affords a privilege to interfere with relations of prospective economic advantage (1) so long as the competitor's purpose is regarded as justifiable in the sense that it is within the limits of the accepted ethical code applicable to such transactions, and (2) so long as he does not resort to fraud or deception or other means which are regarded as "unfair" in the sense that they are outside the limits of current business mores.
Thus the trial judge, in recognition of these principles, as reiterated in the cited cases, supra, and particularly as quoted, supra, from Di Cristofaro v. Laurel Grove Memorial Park, told the jury:
* * * The question to be decided is whether the defendants accepted the services of Blau and then surreptitiously took from Blau the product of its hard work by unjustly using or appropriating the information that it developed. * * *
and
* * * In other words, was the interference by defendants sanctioned by the rules of the game in common morality?
Second, we conceive that our colleague has arrogated to herself the jury's function of drawing inferences from the facts.
Our dissenting colleague states that the record contained not the slightest suggestion that the price reflected the value of the lease. The brief answer is found in what has already been stated. The jury could infer that Alfieri's purchase was inspired and predicated upon the prospect of the lease. He even knew approximately what the lease rental would be by May 1, when he could still have withdrawn from the agreement of sale. So, while it may be true, as stated by her, that the price paid by Alfieri for the land did not reflect the value of the lease per se, a jury could have found that in a *194 larger sense the value of the lease did influence the purchase of the land by Alfieri.
Our colleague states:
As Cali stated, he lacked confidence that the Alfieri deal would be consummated and that is the reason he resisted advising Reitman to discontinue negotiations.
But the jury did not have to accept this as a reason. From what has been said herein, and from all the evidence, they could have inferred that the idea of secrecy was arranged between Alfieri and Cali for the purpose of Alfieri's obtaining the advantage of plaintiff's work as a broker without paying Blau any commission, and at the same time avoiding Blau's endeavoring to interest Reitman's becoming interested in another site.
And Cali had nothing to gain from this secrecy apart from the legitimate reasons be gave for this conduct.
But contrary to this, the jury could infer that Cali wanted most desperately to sell the land  that Alfieri's interest afforded a chance of selling all of it to Alfieri if Alfieri could rely on the probability of the proposed lease. Thus his gain in cooperating with Alfieri was to dispose of the whole tract.
The evidence disclosed no other land available for lease by Reitman.
This is not the sole or even a necessary conclusion. That fact, if true, was not known to Alfieri until after May 4, 1973  after his interest was discovered. What has already been stated herein as reasonable inferences from the secrecy and secret participation of Alfieri evidences a segment of the total picture which was before the jury and which to them justifiably appeared to exhibit conduct within the concept of tortious interference.
*195 Third, our colleague's suggestion that plaintiff's loss came about as the result of Alfieri's purchase or agreement to purchase and that this was one of the not-unexpected consequences known to those engaged in the real estate brokerage business is too simplistic. It ignores all the remaining circumstances already mentioned. It ignores the probability that Alfieri capitalized on plaintiff's experience, work and efforts through a course of misleading actions as well as a course of concealment of his and his associate's motives  not only as to plaintiff and Reitman, but also as to the Cali group, to whom representations were made or assurances given that commissions would be paid to plaintiff for its recognized work.
The principles extrapolated by our colleague from Harris v. Perl, supra, have been applied by us and we have found the liability of the Alfieri group in the light of them. In that case defendants Perl argued that plaintiff broker would not have received a commission even had they disclosed the transfer of title to the land. Chief Justice Weintraub stated, in rejecting that argument:
Defendants' point is unsound. Even under a brokerage contract carefully drawn from a sellers' point of view, the broker earns his commission when title is closed. Here that event occurred and hence plaintiff established the final ingredient of her claim. What the Perls seek to do is to generate an uncertainty which but for their naked assertion would not be in the case. They ask that the Court accept their belief that under no circumstances would they have budged from the figure of $125,000. The claim of course is wholly hypothetical and even the Perls cannot really know how high they would have gone. The question is whether a wrongdoer should be permitted to avoid real damages by raising an issue made hypothetical by his very wrong. We think he should not. The same contention was rejected in Johnson v. Gustafson, 201 Minn. 629, 277 N.W. 252, 255 (Sup. Ct. 1938):
"It seems to us that Clarity's assertion that he would not have paid more than he did ($5,700) in any event comes with poor grace. He was willing to and did concoct a fraudulent scheme. He procured the necessary assistance to bring about a result which, had it not been discovered, would have given him an advantage to the extent of the commission plaintiff was in common honesty *196 entitled to receive. No man should be permitted to reap a profitable crop from seed of the kind here used."
[41 N.J. at 464-465; emphasis supplied]
We do not dwell here on the reasons why we believe the judge properly submitted the liability of the Cali defendants to the jury, because they were acquitted of liability. The propriety of the jury's verdict in favor of the Cali defendants is discussed hereinafter.
We turn now to the contentions of the Alfieri defendants. They first argue that the judge erred in submitting to the jury "the inconsistent demand set forth in the second count of the complaint because the plaintiff had made an election to proceed on the first count." This argument, in effect, subsumes the claim that the judge should have submitted to the jury only plaintiff's demand of $67,500 as the "expectation of economic advantage," instead of $291,500.
The first count of the two-count complaint filed by plaintiff included the assertion that during the Cali-Reitman negotiations it was agreed among plaintiff, the Cali defendants and the Reitman defendants that if Cali built the structures and executed a lease to Reitman, "plaintiff would accept a commission of $67,500 based upon 10% of the sales price and not upon 5% of the gross rentals payable under the lease," provided that Reitman complied with an earlier promise to give to plaintiff the exclusive right to sell the Reitman defendants' properties in Newark when no longer required. The second count merely referentially repeated the allegations of the first count and alleged that upon the failure and refusal of the Cali defendants to pay the commission of $67,500 earned by plaintiff and the failure of the Reitman defendants to execute and deliver exclusive-agency agreements "the lease made between defendant Creston and the Reitman defendants * * * should be subject to commissions payable to the plaintiff equal to 5 per centum of the gross rentals for the term of that lease."
*197 Our review of the allegations of the complaint leads us to conclude that the argument of the parties as to the fair interpretation of the complaint is debatable. It cannot be said with confidence that plaintiff's expectation was limited to $67,500. The fact remains that defendants were placed on notice that plaintiff sought as damages 5% of the rentals to be paid under the lease negotiated between Creston Associates and Galsworthy, Inc. Defendants were aware of this demand for a long interval between the institution of the action in January 1974 and the first day of trial, March 30, 1976  two years and three months  during which time extensive discovery proceedings were undertaken. Plaintiff's answers to interrogatories submitted to it were consistent with its maintenance of a claim for rental commissions.
It may be acknowledged that during the course of the trial defendants introduced evidence which challenged plaintiff's contention that rental commissions were reasonably in the contemplation of plaintiff. For example, plaintiff's letter to Alfieri, dated the same date (May 4, 1973) that details of the long-term lease between Alfieri and Reitman were tentatively agreed to at a meeting in Reitman's office, states that "you will be obliged to pay us for our brokerage services rendered, the sum of $67,500 as our fee in connection with this matter."
It may also be noted that in November 1974, about 11 months after plaintiff filed its complaint, it accepted the mentioned exclusives from the Reitman defendants. However, other evidence may be said to militate against Alfieri's position on this point. For example, Stein testified that he told Alfieri when he talked to him shortly after the May 4, 1973 meeting terminated that plaintiff would accept $67,500 "just to get finished." The disputed testimony and inferences made the issue as to plaintiff's economic expectations eminently one for the jury under appropriate instructions. Such instructions were in fact given without objection.
*198 The Alfieri defendants assert that Jersey City v. Hague. 18 N.J. 584, 603 (1955); Ajamian v. Schlanger, 14 N.J. 483, 490 (1954), cert. den. 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954); Spiotta v. Milkon, 70 N.J. Super. 344, 350 (Ch. Div. 1951), aff'd 77 N.J. Super. 348 (App. Div. 1962), and Young v. George C. Fuller Contracting Co., 12 N.J. Super. 554, 561-562 (Law Div. 1951), support their position that plaintiff was obliged to make an election once it knew the full facts. The requirement to make an election is generally grounded in principles of waiver or estoppel. Republic of China v. Pong-Tsu Mow, 15 N.J. 139, 145-146 (1954). Unless a party may be prejudiced in either presenting or defending his case by reason of the failure of another party to make an election of any type, an election need not be made. There is no evidence that Alfieri was prejudiced by the alternative claims. Consistency in pleading is not required. R. 4:5-6. Consistency in claims or demands is required only when the claims or demands cannot be reconciled. Jersey City v. Hague, supra, 18 N.J. at 604. The following statement from Young v. George C. Fuller Contracting Co., supra, 12 N.J. Super. at 561, as quoted by our Supreme Court in Jersey City v. Hague, supra, is especially apt:
* * * Hence it might aid justice, not to compel the party to gamble on the finding of the jury, but to submit his case to them alternatively or hypothetically. In other words, the party could submit to the court that, if fact A exists, then result (1) should follow, but if fact B exists, then result (2) should follow, this perchance in the form of a request for special verdict. [18 N.J. at 605]
As stated, such submission was made to the jury in the instant case. There was no inconsistency in this case which would warrant the court to compel plaintiff to make an election. Moreover there was no basis for an estoppel against plaintiff's right to recover commissions on the rentals.
Defendants next assert that the judge erred in permitting Stein to testify as to the standard brokerage commission *199 of 5% of gross rentals to be paid under leases. This objection was predicated upon plaintiff's failure to include Stein as an expert witness in answers to interrogatories. We cannot accept this proposition. Testimony of an expert is generally proscribed where the expert's name is not provided in response to an interrogatory asking the names of expert witnesses, or in a timely amendment thereof. R. 4:17-7. However, in a number of circumstances the rule is relaxed. Most notably, where the failure to supply the name of a witness was not the result of a design to mislead, and the opposing party is not surprised nor prejudiced, the testimony is allowed. Brown v. Mortimer, 100 N.J. Super. 395 (App. Div. 1968). Hillas v. Westinghouse Electric Corp., 120 N.J. Super. 105 (App. Div. 1972), certif. den. 62 N.J. 83 (1972), is illustrative of the liberal relaxation of the rule with respect to opinion testimony. There, a factual witness named in answers to interrogatories was allowed to testify as an expert on the subject of elevators where pretrial depositions demonstrated his expertise, although his name had not been included in the answers to interrogatories as a proposed expert.
We are satisfied that defendants were neither surprised nor prejudiced by the testimony. It was consistent with plaintiff's contention that 5% was the standard. We agree with plaintiff that the argument underlying this point is premised on defendants' contention that plaintiff had elected to claim only commissions of $67,500 and is not premised on their being surprised. Thus, during argument before the trial judge defendants' attorney stated: "* * * [B]ut I have an objection to Mr. Stein or any other witness * * * testifying to what the standard or norm in the industry may be with respect to commissions because that's not an issue in this case."
Defendants also argue that the admission into evidence of a memorandum made by Seminara, one of the Cali defendants' principals, indicating that Alfieri recognized an obligation to pay commissions to plaintiff, was *200 prejudicial error. The disputed exhibit is a memorandum prepared by Seminara, relating a discussion that took place at the closing of the Cali-Alfieri sale on July 10, 1973. It reads as follows:
On Tuesday, July 10, 1973 at the closing between Cali Wellcald Associates and Creston Associates, which took place at the offices of Nuzzo & Nuzzo, 780 Totowa Road, Totowa, New Jersey, the following statement was made by Dominick Alfieri in reference to the Blau and Galsworthy liquor building.
Mr. D. Alfieri stated that he was going to use the difference in money, between the acreage price we had sold the property to his company and the acreage price that Cali Wellcald had given the Galsworthy people, towards paying the commission that he thought would have to be paid to the Blau agency for the Galsworthy deal.
People in attendance were: Mintz, Seymour Sperber, Ignatius F. Seminara, Edward Leshowitz, and Harvey Schultz.
Without objection by Alfieri's attorney, counsel for Blau read the memo to the jury as part of the deposition of Seminara. Over objection it was offered into evidence at the close of plaintiff's case. Alfieri later testified about the memo, explaining that although he did not admit liability he knew there was going to be expensive litigation and therefore a settlement was discussed.
Ordinarily a statement by a party is permitted in evidence as an admission. Evid. R. 63(7). On the other hand, offers of compromise are excluded. Evid. R. 52. The subject statement was unrelated to settlement negotiations. None of plaintiff's representatives was even present. One of the underlying reasons for the exclusion of this type of evidence is the social policy favoring and encouraging amicable out-of-court settlements. Rynar v. Lincoln Transit, Inc., 129 N.J.L. 525 (E. & A. 1943); Evid. R. 52, Comment § 52-1(a). Here the evidence served a valid purpose and was relevant for its probative effect upon plaintiff's contention that Alfieri had bought the land from Cali with Reitman's plaintiff-induced interest as a motivating factor. The statement attributed to Alfieri tended to undermine Alfieri's *201 contention that in negotiating for the premises with Cali he did not do so with a belief that he might be liable for commissions to plaintiff.
In any event, the evidence was not prejudicial. Alfieri testified about the memorandum, explaining that although he did not admit liability he knew that there was going to be expensive litigation and therefore a possible settlement was discussed among Cali, Seminara and Alfieri. We therefore find that this point lacks merit.
Defendants next contend that the judge erroneously granted a summary judgment for the Reitman defendants. Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2.
Even though the allegations of the pleadings may raise an issue of fact, if the other papers show that, in fact, there is no real material issue, then summary judgment should be granted. Judson v. Peoples Bank and Trust Co. of Westfield, 17 N.J. 67, 75 (1954). These standards govern decision of the motion in the first instance, as well as the decision on appeal. Since plaintiff has not appealed the summary judgment, we are concerned only with the dismissal of the Alfieri defendants' crossclaim against the Reitman defendants. This crossclaim sought indemnity as well as contribution. There was not the slightest hint in the crossclaim that the Reitman defendants' liability to the Alfieri defendants was posited upon an allegedly express promise to Alfieri by Reitman through his attorney Mandelbaum that Reitman would "work out" the brokerage commission and that Alfieri's proposed rental notice should not include a broker's commission. Notwithstanding that depositions taken in preparation for the trial disclosed such an alleged promise, when the motion for summary judgment was submitted to the judge, Alfieri never submitted any *202 materials or arguments to the judge on the point. Even after the judge's ruling the Alfieri defendants moved for a rehearing only as to the judge's denial of their own motion for summary judgment.
Now the Alfieri defendants assert that plaintiff's brief before the judge in connection with the motion referred to a portion of the depositions which mentioned the Mandelbaum promise. They also state that they sought leave to appeal from the judge's denial of their motion for summary judgment and argued before the trial commenced that the judge's denial was error.
R. 4:46-5(a) requires an adverse party to respond to a motion for summary judgment by affidavits or otherwise, in order to "set forth specific facts showing that there is a genuine issue for trial." He may not rely merely on the allegations of his pleadings. Nor may a defendant expect a judge, especially in a complex case wherein hundreds of pages of depositions and interrogatories have been filed, to assume, in the absence of a brief from that party, that the depositions or interrogatories may contain materials which militate against the position of the moving party.
We are constrained, however, to reverse the dismissal of the crossclaim as to indemnification notwithstanding the failure of the Alfieri defendants to alert the judge to the reasons for denying the motion to dismiss. Not only was the deposition testimony concerning Mandelbaum's solicitation of Alfieri to not increase the rent to accommodate plaintiff's commission brought to the judge's attention in plaintiff's brief, but the judge stated in his letter opinion that "[a]n examination of the briefs and depositions would lead to the conclusion that no factual dispute presents itself for jury resolution." Such examination should have induced the judge to deny the motion to dismiss Alfieri's cross claim, in the light of the testimony and inferences arising therefrom. However, in reversing the judgment dismissing the crossclaim, we do not hold that this necessitates a new trial. The crossclaim may be tried independently following a pretrial *203 conference. Cf. Mickens v. Marascio, 58 N.J. 569, 574 (1971); Harris v. Perl, supra 41 N.J. at 465-466.
We will consider points II, III and VIII advanced by the Alfieri defendants together. These are:
II. The evidence presented to the jury is too uncertain, remote and vague to permit any judgment to be entered on the basis of the verdict.
III. The verdict against the Alfieri defendants and exonerating the Cali defendants was so against the weight of the evidence as to constitute a clear miscarriage of justice.
VIII. The verdict against the Alfieri defendants was so against the weight of the evidence as to constitute a clear miscarriage of justice.
We disagree that the exoneration of the Cali defendants while holding the Alfieri defendants liable was so against the weight of the evidence as to constitute a miscarriage of justice. The evidence supported a finding that the Cali defendant acted properly. They had the right to sell their land. Reitman could have had an option to purchase but refused it. Cali paid a commission to a broker on the sale to the Alfieri defendants. The Cali defendants told Alfieri of Reitman's intention to enter into a lease and of plaintiff's services as a broker. The jury could have found that Cali, although acting in combination with Alfieri as already related, did not know that Alfieri intended to attempt to escape the payment of commissions to plaintiff; that the Cali defendants did not act tortiously toward plaintiff because they paid a commission to Mintz, and also that, all through their cooperation with Alfieri, Alfieri stated or led them to believe it was his group's intention to pay commissions to plaintiff. Accordingly, the jury could have reasonably determined, as it did, that the conduct of the Cali defendants did not constitute the tortious interference for which plaintiff sought damages against them. The Cali defendants were under no legal obligation to continue to deal with the Reitman defendants, once having sold the *204 land to Alfieri  indeed, they had nothing to sell. Plaintiff's right to commissions did not accrue until Reitman executed the lease. This actually occurred after Cali had conveyed the land to Alfieri.
That the Cali defendants may have derived a benefit as a result of Reitman's interest in the land (already discussed as being the triggering reason for the purchase by Alfieri defendants) alone is insufficient to support liability against the Cali defendants. The principles of tortious interference are somewhat amorphous. Sustick v. Slatina and Myers v. Arcadio, Inc., supra. See also, McCann v. Biss and Harris v. Perl, supra. We cannot disagree with the jury's determination that there was no transgression.
For the reasons earlier stated, we are satisfied that the judge properly submitted the question of the Alfieri defendants' liability to the jury. We do not agree that the verdict against them was so against the weight of the evidence as to constitute a miscarriage of justice.
Alfieri further contends that the judge erred in failing to declare a mistrial by reason of an incident which occurred. Specifically, after the close of all the evidence counsel for the Cali defendants reported to the judge that he believed two jurors overheard Alfieri offer to settle the case with Stein in the corridor outside the courtroom. Subsequently the judge questioned both of these jurors on the record outside the presence of counsel. One of the jurors stated that she overheard nothing. The other stated that all he heard was as follows:
MR. ALOIA: One said, "Who's got the cards?" And then the other one said  I don't know who it was  "Well, it's a different story you're talking about now than you did the other day"  not a different story but "different figure." That's all I heard.
THE COURT: Do you know which one that was?
MR. ALOIA: I think it was Stein got out of the booth or  I don't remember what the other man's name is  Zimmel?
THE COURT: Yes.
MR. ALOIA: They were at the booth. Now, I don't know which one was in the booth and got out.
*205 THE COURT: Yes.
MR. ALOIA: And I think it was what's his name, Mr. Seminara?
THE COURT: Seminara.
MR. ALOIA: He's from the Cali group?
THE COURT: Yes, that's right.
MR. ALOIA: He was talking, and he said something about  I think it was him that said something about, "It's a different"  "It's a different"  "You're talking about a different price now than you did the other day," or something to that.
THE COURT: I see.
MR. ALOIA: "A different figure"  not a price  "Different figure," and that was all I heard.
THE COURT: Did that mean anything to you one way or the other?
MR. ALOIA: No.
THE COURT: Will that affect your decision in this case one way or the other?
MR. ALOIA: No. I thought maybe they were trying to settle it between them but it wouldn't affect anything.

* * * * * * * *
THE COURT: * * *
You didn't discuss this with any of the other jurors, did you?
MR. ALOIA: I did tell it to them, what I just overheard, and I said, "Maybe they're trying to settle the case."
THE COURT: But that's as far as it went?
MR. ALOIA: That's as far as I went with it.
Thus it appears that none of the Alfieri defendants was a party to the conversation. In fact, it also appears that the juror never even heard the conversation which was reported by Cali's counsel to the court. It was an entirely different one. The judge reported the substance of the interview to the attorneys. Alfieri's counsel never moved for a mistrial. Instead, although expressing uncertainty about the prejudicial effect of the overheard conversation, he along with other counsel for the parties suggested what cautionary instructions should be given by the court.
The judge commenced his charge as follows:
Now, members of the jury, at the outset I just want to comment on an incident that occurred yesterday morning. I was informed that one of the jurors overheard a discussion in the hallway yesterday morning between a couple of the parties or witnesses. While the entire *206 context of the conversation was not heard by the juror, when I interrogated him he advised me that he gathered from the small part of the conversation that he heard that it concerned a possible settlement. Now, I looked into the incident and I found that the discussion did not concern a settlement, and whatever the nature of the conversation it was carried on in jest. Now, the juror and any other members of the jury who may have heard the discussion or who may have been told of the discussion should disregard it. By that I mean you should not consider or allow any aspect or inference of such conversation to influence your verdict one way or the other. As I said at the beginning of this case, your verdict must be based upon the evidence, that is, what you heard in the courtroom not what you might have heard said outside of the courtroom. So that please keep that in mind and expel it from your mind if any of you heard or any of you have any feeling that you may make any connotations from such a discussion.
What was stated was altogether consistent with the oral requests of various counsel.
Alfieri's arguments on this point are frivolous in the light of what occurred. For example, now it is contended that the judge should have interrogated all the jurors. That was not suggested to the trial judge by anyone. It is also contended that Alfieri was a party to the conversation "because the attorney for Cali defendants overheard the offer. But counsel for Alfieri defendants told the trial judge," * * * and the inference I draw is that he [the juror] probably didn't hear anything about the first conversation that Mr. Nuzzo [attorney for Cali defendants] mentioned but was talking about another conversation that occurred between different parties and a different subject."
The fundamental question in cases where irregularities involving jurors occur during a trial is:
* * * whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so. * * * [Panko v. Flintkote, 7 N.J. 55, 61 (1951)]
*207 Notwithstanding the lack of a motion for a mistrial, we have carefully examined the record for the purpose of determining whether the judge committed plain error, R. 2: 10-2, in not declaring a mistrial. We have concluded that he did not. This conclusion is derived from the foregoing recital of the events following the report of the irregularity to the trial judge and also from the fact that none of the Alfieri defendants was shown to have been involved in the conversation. It will be recalled that Seminara, to the juror's knowledge, was affiliated with the Cali defendants, and yet the jury returned a verdict in favor of the Cali group. We summarize our overall review by stating that we do not believe that the alleged conversation reported by the juror could have had a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the judge's charge.
The Alfieri defendants urge that the evidence presented to the jury was too uncertain, remote and vague to permit any judgment to be entered on the basis of the verdict. This argument proceeds upon the assumption, not that the overall evidence was insufficient, but that the verdict of "5% of gross rentals is a meaningless, indefinite and speculative conclusion" because the 20-year lease contains three options to purchase which, upon the exercise of any one of the three by the lessee, could terminate the payment of rent and, in turn, commissions.
The lease was an exhibit in the case. The jury had an opportunity to examine it. According to its terms Galsworthy, Inc., the tenant, was given options to purchase within 180 days after the tenth year of the term of the lease, within 180 days after the fifteenth year of the term of the lease or within 90 days after the nineteenth year of the term of the lease.
The judge charged the jury on this point that their award "may be in the amount of the normal rate of commission, five percent of the gross rents, namely, a figure of $291,900." But he also told the jury:
*208 You may also consider, however, the options to buy which were given to Reitman, and this rental figure would be diminished to the exercise of such an option and thereby diminish the loss sustained by the plaintiff. Here again you must consider all of the testimony and evidence in arriving at your conclusions, so you will recall that that lease arrangement would provide that Reitman at the end of a certain period, five, ten, twenty years, as I understand, would have a right to purchase that property. Now, if they exercise that option in a minimum period of time or any period of time, that, of course, would reduce the total amount due under the lease and, therefore, the total percentages claimed by the plaintiffs in this connection. Now, that is, generally, the rule of law as applied to the compensatory damages in this case.[6]
The jury's verdict as announced by its forelady was:
Your Honor, we, the members of the jury, find for the plaintiff. The Blau Group should receive five per cent on the lease between Creston Associates and Galsworthy, Inc.
None of the attorneys objected to the portion of the charge as to damages on the grounds now mentioned. However, after the above verdict was announced and after a discussion of the verdict among the judge and counsel the jury was asked to clarify its verdict by whether "you mean five per cent of the gross rentals or not?" and as against which or all defendants the verdict was returned. The jury retired for further deliberations. Upon its return the jury announced that its verdict was intended to be against the "Alfieri Group" for 5% of the gross rentals.
At a subsequent hearing for judgment n.o.v., R. 4:40-2, or for a new trial, R. 4:49-1, counsel for Alfieri suggested that because of the uncertainty of whether rent under the lease would be paid for the entire 20-year life of the lease, in view of the option features, the commission should be paid as the rental payments are received by the landlord.
Rejecting this suggestion, the judge mistakenly analogized the necessary speculation of a jury as to damages in actions *209 for negligently caused death or permanent injuries with the speculation in which he felt the jury could indulge in the instant case. There are obvious differences between these cases. Most importantly, the measure of damages in this case is circumscribed by the amount of the reasonably expected economic advantage  a much less speculative amount than permissible in the mentioned negligence cases. Here, the jury refused to award punitive damages, although the court submitted that option to it. The jury intended only to award compensatory damages. In actions for permanent injuries or death resulting from tortious conduct the defendants are entitled to have the recovery discounted to present value, "a procedure [in a death case] which recognizes that the deceased would have had his income spread out over the remaining years of his working life, had he lived." Tenore v. Nu Car Carriers, 67 N.J. 466, 474 (1975).
The jury in the instant case knew that 5% of the gross rentals over the 20-year term of the lease amounted to $291,900. The judge specifically told it so in his charge. Yet it significantly failed to return a verdict for that sum. We would infer that it intended that the judgment be molded so that plaintiff would receive what he conventionally was entitled to  commissions on the rental as it was paid by Galsworthy, Inc. and as it was received by Creston Associates. Cf. Turon v. J. & L. Const. Co., 8 N.J. 543 (1952).
Apart from this, plaintiff should not receive the full amount of commissions at the present time. If it did, it would be paid an excessive amount, since it would have the use of funds which ordinarily it would not receive or be entitled to receive except by installments over a long term. Additionally, there was no evidence before the jury whereby it could intelligently prognosticate whether or not any one of the options would be exercised.
The instant case, so far as damages are concerned, greatly resembles an action of breach of contract for brokerage commissions. Consequently, we see no reason why for the sake of justice we should not apply that same rule here. We feel *210 constrained to adopt the reasoning of the court in City of Hampton, Virginia v. United States, 218 F.2d 401 (4 Cir.1955), wherein the court said:
* * * Whatever be the rule with respect to other contracts, it is clear, under the authorities, that for breach of a contract for the payment of money in instalments, where the contract is unilateral or has become unilateral as the result of performance by the complaining party, the right of recovery is limited to the instalments due at the time of institution of suit. New York Life Ins. Co. v. Viglas, supra [297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971 (1936)]; Roehm v. Horst, 178 U.S. 1, 18, 20 S.Ct. 780, 44 L.Ed. 953; General American Tank Car Corp. v. Goree, 4 Cir., 296 F. 32; Moore v. Security Trust & Life Ins. Co., 8 Cir., 168 F. 496; Washington County, Neb., v. Williams, 8 Cir., 111 F. 801, 810, 811; Simpson v. Scott, 189 Va. 392, 53 S.E.2d 21; Holcomb v. Weblee, 185 Va. 150, 37 S.E.2d 762; Restatement of Contracts, §§ 316, 317, 318, 1948 Supplement; 12 Am. Jur. p. 983; note 105 A.L.R. 460, 465. Of course, the effect of a judgment for the past due instalments is to establish the liability of defendant under the contract, as fully as if this were done by declaratory judgment; and on the principle of res judicata this will facilitate recovery on other instalments as they fall due. [at 405]
See also, R. 4:42-7; 12 C.J.S. Brokers § 121 at 319; 22 Am. Jur.2d, Damages, § 29 at 50; Coughlin v. Blair, 41 Cal.2d 587, 262 P.2d 305 (Sup. Ct. 1953); Arnone v. Chrysler Corp., 6 Mich. App. 224, 148 N.W.2d 902 (Ct. App. 1967). Thus, plaintiff will receive the commissions as they fall due. Should any one of the options be exercised or should the payment of rent cease for any valid reason, then the occurrence of either event will have its proper effect upon the payment to plaintiff.
Accordingly, for the stated reasons and purposes the summary judgment as to the Alfieri defendants' crossclaim against the Reitman defendants is vacated. The judgment as entered for plaintiff against Dominick Alfieri, Creston Associates and Harvey Schultz is also vacated, with directions to determine if Galsworthy, Inc. remains a tenant under the lease between it and Creston Associates. If so, judgment shall be entered in favor of plaintiff and against the foregoing defendants *211 Dominick Alfieri, Creston Associates and Harvey Schultz for an amount equal to 5% of the gross rentals paid to the date of the entry of the judgment, together with such interest as may be appropriate. Kotzian v. Barr, 152 N.J. Super. 561 (App. Div. 1977). Plaintiff's right to future damages shall be dependent upon the continuance of the payment of rent under said lease. As to liability therefore, the principle of res judicata will control. We do not retain jurisdiction.
MORGAN, J.A.D. (dissenting).
My disagreement is a fundamental one. In my view, nothing that Alfieri did or failed to do can be characterized as tortious. Even more significantly, those acts or omissions of Alfieri which my colleagues characterize as tortious, or as permitting an inference that they were tortious, caused plaintiff no loss. I would therefore not only reverse but would enter judgment in Alfieri's favor.
Presentation of my view, unfortunately, requires some factual development which, however, because of my announced conclusions as to how this case should have been decided, will be confined largely to undisputed factual material and only to those facts relevant to the legal analysis which follows. Those undisputed facts disclose that during the latter part of 1972 the Cali group of defendants, owners of an undeveloped 44 acres of industrial land in West Caldwell, decided to sell it and in pursuit of that endeavor dealt through at least two and perhaps more real estate brokers. Plaintiff, who came to them by way of the Reitman group, was one, and Alan Mintz, who introduced them to Alfieri, was another. Both Mintz and plaintiff clearly understood that they were not invested by Cali with an exclusive agency to sell but that Cali was at all times dealing with other brokers.
Through plaintiff, Reitman became interested in purchasing only that portion of Cali's land necessary to accommodate a building for his business. Initial discussions took *212 place in December 1972, as a result of which Cali, in writing, agreed with plaintiff for the payment of any commissions to plaintiff resulting from either a sale or lease of the land. Discussions between Reitman and Cali concerning sale, not a lease, of a portion of the land, with plaintiff officiating, continued until February 22, 1973 when an oral agreement was reached along those lines evidenced by a written agreement of sale, drafted by Cali at Reitman's request and sent to Reitman's attorney, David Mandelbaum. This contract was never executed because Reitman, having only then acquired another company, was short of the cash necessary to consummate the transaction orally agreed to.
While Cali's negotiations with Reitman were taking place, Alfieri, a land developer, became interested in purchasing the entire tract of land through the efforts of another broker, Alan Mintz. The undisputed evidence is that Cali's negotiations with Alfieri commenced in January 1973, during the same period Reitman was negotiating for sale of a part of the land, with parallel negotiations for sale continuing thereafter between Alfieri-Cali and Reitman-Cali throughout January and February 1973.
As noted previously, although Reitman first arrived at an agreement with Cali, Reitman backed out for lack of cash. Cali, however, had never ceased negotiations with the Alfieri group despite his oral agreement with Reitman, and on March 16, 1973, after Reitman's repudiation of his prior oral agreement with Cali, orally agreed with the Alfieri group on a purchase of the entire tract at an agreed per acre price. It was this oral agreement which was finally embodied in the critical written contract of sale which was executed by Cali and Alfieri on April 18, 1973.
Although during January and February 1973 Cali was negotiating with the Alfieri group through Mintz, and with the Reitman group through plaintiff Blau, Alfieri, Reitman and plaintiff remained strangers to each other, and if Alfieri knew of Reitman's interest in the land which he, Alfieri, was negotiating for, that was all he knew  that *213 Reitman and plaintiff, Reitman's broker, were his competition for the land he wanted. Moreover, during that period of time Reitman was not negotiating for a lease of a building to be constructed on the land; that form of transaction had not been conceived until the first week in March 1973 when Reitman found himself in a financial position which precluded a purchase and allowed only a lease.
The uncontradicted testimony of David Mandelbaum, Reitman's attorney, was that the idea of a lease for Reitman first emerged on some undetermined day during the first week in March 1973 when he and Reitman discussed the impossibility of Reitman's going through with the purchase agreement offered him and Mandelbaum suggested that Reitman approach Cali concerning the possibility of a lease. Hence, on March 16, 1973, when the Alfieri group orally agreed on their purchase, the Reitman lease was only a possibility to be investigated. The record thus permits no inference that Alfieri's interest in the land he had agreed to purchase was influenced in any way by the Reitman lease which was, at the time of Alfieri's oral agreement, a bare possibility.
When Alfieri orally agreed on the terms of a purchase of the entire tract, Cali was no more secure in that transaction than he was in the prior oral agreement reached with the Reitman group. In both cases the oral agreements were unenforceable, and the Cali group knew that. It is clearly inferable, therefore, that such was the reason Cali failed to advise Alfieri of his earlier agreement with Reitman, and failed to disclose to Reitman the fact of his later oral agreement with Alfieri. Indeed, after the oral Alfieri-Cali agreement of March 16, 1973, Cali continued negotiating the lease with the Reitman group, thus keeping all options alive.
Hence, following the Cali-Alfieri oral agreement of March 16, 1973, Reitman, unknowing of Cali's oral agreement with Alfieri, retained an architect to make drawings of a building suitable to Reitman's business needs which might later *214 be the subject of a lease,[1] and applications were made by Cali on behalf of Reitman to the local planning board for the necessary municipal permits. This latter application occurred during the early part of April 1973 after the oral agreement with Alfieri but before execution of the written Alfieri-Cali contract on April 18, 1973. Once the drawings were received (on or about April 3, 1973), it was decided that bids from contractors would be solicited, with Cali retaining the right to submit a bid; that was done, also in Reitman's ignorance of Alfieri's unenforceable interest in the land prior to April 18, 1973. Such bids were solicited and received after the written Alfieri contract was executed, with Cali himself submitting a bid at that time.
Several observations must be made concerning the foregoing undisputed facts. Alfieri's interest in the land was independent of any Reitman lease because, at the time that his interest in the land was first manifested, the idea of a lease had not even been conceived and, notwithstanding, Alfieri negotiated seriously for the purchase of the entire tract. Further, when on March 16, 1973 Alfieri orally agreed with Cali to the purchase, that agreement was also independent of any Reitman lease because at that time the lease was simply a possibility being investigated, its idea having been only conceived two weeks earlier. Before the time the architect was retained and bids from contractors solicited and received, Alfieri had orally agreed on the per acre price of the land he was to purchase, and the record contained not the slightest suggestion that the price reflected the value of the lease. Further, the written contract of April 18, 1973 reflected exactly the earlier agreed-to price and hence the written contract also did not reflect the value of the land enhanced by the lease. Moreover, Cali *215 did not cease negotiations with either party on the occasion of an unenforceable oral agreement, first with Reitman and then with Alfieri, desiring to keep all of his options open until he was confident that a fully enforceable agreement would be consummated and a disposition of the land a legal certainty.
I can discern no basis for an obligation upon Alfieri, certainly before April 18, 1973, to communicate with Reitman or plaintiff advice of his interest in the land simply because he may have known of Reitman's similar interest, and I do not read my colleagues' opinion as suggesting such an obligation. Rather, the obligation of disclosure, breach of which provides one aspect of Alfieri's found tortious conduct, arose, according to the court's opinion, on the execution of the April 18, 1973 contract. My colleagues seem to be taking the position that once that contract was executed, Alfieri was obliged to write Reitman or plaintiff a letter or telephone them, both total strangers with whom he had no legally recognizable relationship, to advise them of his purchase. Moreover, they must be suggesting that this obligation should have been promptly performed; compliance two weeks later would not be sufficient. I can discern no source for this obligation and no reason in public policy or fairness, or custom of fair dealing, for it. My colleagues cite to no authority, statutory or decisional, imposing such an obligation upon a successful purchaser of land to advise all others who may have evidenced some interest in the land of his purchase. Doubtless, such advice would have been a nice thing to give, but I question that it rose to the level of a legally imposed obligation for the breach of which substantial damages would be recoverable. Indeed, I suspect that most successful purchasers of land would be astonished to know of their obligation to notify all competing purchasers or lessees of the success of their negotiations.
Although my colleagues postulate secretive conduct on the part of Cali and Alfieri concerning the execution of the April 18, 1973 contract, I discern no such conduct apart *216 from the failure to telephone or write plaintiff or Reitman concerning it. For the undisputed fact is that Alfieri, not more than two weeks after execution of his contract of purchase, brought his equipment on the land, thus notifying all who wished to know of it that he had an interest therein. Indeed, it was from this conduct, which can hardly be characterized as secretive or clandestine, that plaintiff and Reitman learned of the April 18, 1973 contract.[2]
It's true that Alfieri did not bring his equipment on the land for the specific purpose of informing Reitman that the land was his but rather for the purpose of dealing with the soil contingency clause of the contract which persisted for 21 days after its execution. Such conduct, nonetheless, clearly negates secrecy and evidences an unawareness by Alfieri of the obligation created by this court in its opinion to promptly advise unsuccessful negotiators that their further negotiations would be fruitless. Had Alfieri been aware of this recently created obligation, he could easily have complied therewith with no adverse consequences to him and no discernible benefits to either Reitman or the plaintiff. And this ineffectiveness of the prompt disclosure my colleagues seem to be demanding without authority is one of the bases for this dissenting opinion, the lack of causality between such conduct, secretiveness, and plaintiff's loss of its expected commissions.
Cali's conduct after execution of the April 18, 1973 contract was undoubtedly secretive. It will be remembered from this court's opinion that Cali submitted a bid for construction of the building Reitman was thinking of leasing after execution of the Alfieri-Cali contract; clearly submission of such a bid should have been accompanied by disclosure of the Alfieri-Cali contract if Cali were to be viewed as candid. And Seminara, Cali's employee, denied the contract to Reitman *217 and plaintiff after its execution, further evidencing lack of candor. It is one thing, however, to discern lack of candor and another to predicate substantial liability on such a foundation without any authority for so doing. Again, the only authority referred for this obligation of disclosure is some vague conception of what would have been the moral thing for Cali to do  not a solidly grounded legal obligation to do so.
The jury, however, in exonerating Cali from all liability clearly decline to view this conduct as significant. And, in fact, the record discloses good reason for Cali's conduct in this regard and on an undisputed basis.
By his uncontradicted testimony, Cali negated any malicious component to this secretive conduct. As he testified, he was aware that his contract with Alfieri contained a soil contingency clause and that the contract was not therefore final as far as he was concerned. Alfieri might well have found the soil conditions unfavorable to his plans, and the contract would then have been at nought. Cali, desiring to dispose of this land, was using the pending Reitman negotiations as a fallback position in the event the Alfieri-Cali deal fell through by reason of unfavorable soil conditions. As Cali stated, he lacked confidence that the Alfieri deal would be consummated and that is the reason he resisted advising Reitman to discontinue negotiations. Such considerations are valid business reasons for his conduct, cannot be regarded as malicious and, more importantly to the problems here presented, caused plaintiff no loss whatever. Had he told them promptly, as this court seems to think he should have, plaintiff's loss of commissions would have been precisely the same as it was. And Cali had nothing to gain from this secrecy apart from the legitimate reasons he gave for this conduct. In any event, as previously noted, the jury regarded this conduct as being of little moment since they exonerated Cali from all liability.
Moreover, there exists substantial doubt that secretiveness in negotiations, in the sense of concealing from competitors *218 the existence or progress of parallel negotiations, is regarded as the kind of conduct which will ground an action in tort for interference with prospective business advantage. Prosser observed:
In short, it is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may * * * allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability. [Prosser, Torts (4 ed. 1971), § 130, at 954-955; emphasis supplied]
Hence, to summarize to this point, Alfieri was under no obligation to impart to Reitman or plaintiff promptly after execution of the April 18, 1973 contract news of the success of his negotiations with Cali. He was not, in fact, secretive, since not more than two weeks after the contract he engaged in conduct negating secretiveness by bringing his equipment on the land he purchased, thus notifying the world and plaintiff of his recent purchase of the land.
The other aspect of Alfieri's conduct which my colleagues characterize as tortious, or which they conclude a jury could have so characterized, was Alfieri's participation in designing Cali's bid for construction of the building which Reitman was considering leasing, without disclosing that he had done so. My colleagues view this conduct as malicious. First, I do not so view it and, secondly even if it could be so characterized, I fail to see how it deprived plaintiff of anything. Alfieri's participation in Cali's bid was after Alfieri signed the contract and, as I will later point out more fully, it was that contract which marked the end of plaintiff's expectancy of economic benefit from its efforts on Reitman's behalf. How was plaintiff damaged by this conduct? My colleagues don't say except to suggest that perhaps, as part of the failure to disclose Alfieri's purchase of the land, it precluded plaintiff from inducing Reitman to reject the lease of Cali's now Alfieri's, *219 land in favor of a lease of other lands which could have produced commissions for plaintiff. I am not impressed. Damages were not assessed on the basis of another deal plaintiff could have engineered, but on the basis of a Cali-Reitman, or the Cali-Alfieri, lease. The evidence disclosed no other land available for lease by Reitman; rather, the undisputed evidence establishes just the reverse  that no other land suitable to Reitman's purposes was available. After Reitman discovered that Alfieri was the new owner of the land and that it would be from Alfieri that the building would have to be leased, Reitman testified that he was most upset, was determined not to deal with Alfieri, and embarked upon what he termed a "rock-ribbed" search for other alternative land sites for the building he wished to lease. No other land was found, and it was only after this unsuccessful two-three-week "rock-ribbed" search that Reitman returned to Alfieri to negotiate a lease with him. The record suggests no land that went off the market during the two-week period between the Alfieri contract and the date the existence of that contract was discovered. Again, plaintiff lost nothing as a result of its delay in learning about the contract. Nothing in this record suggests that it did.
My colleagues' suggestion that perhaps the secretiveness, compounded of the failure to notify Reitman or plaintiff of Alfieri's contract or of the fact that Alfieri had designed the bid Cali submitted, was intended to place Reitman in a "tight spot" so that he (Reitman) would have been compelled to execute a lease, is nothing but sheer speculation which, even if true, does not spell out a case warranting imposition of liability. Nothing in the record suggests that Reitman was in an ever tightening spot as time went on. He had been negotiating with Cali from December 1972 without ever having made a binding commitment or advanced one penny of hard cash. How or why, or if he was becoming more desperate with the passage of each day, is not explained by the testimony in this case. Certainly, Reitman would have been as able to *220 search for alternative sites a few weeks later, as he did when he learned of Alfieri's contract.
Moreover, if morals are to be considered, it seems to me that plaintiff, as Reitman's agent and fiduciary, was obligated to act in the best interests of his principal. The fact that Reitman's best interests might lie in leasing from Alfieri in a transaction which would yield plaintiff no commission provides a poor excuse to plaintiff to induce Reitman to relinquish a beneficial lease in favor of some lesser alternative simply for the purpose of obtaining commissions for plaintiff. In any event, such a theory of recovery was never pleaded, argued or charged to the jury, and was never even argued to this court on appeal. Nothing factually or legally suggests merit to this court's position in that regard.
Alfieri was charged with the tort of maliciously interfering with plaintiff's economic expectations; that was the theory upon which the case was submitted to the jury and the theory upon which plaintiff's recovery was sought to be sustained on appeal. Its expectation of economic advantage was the contract for commissions from Cali contingent on a successful consummation of a transaction with respect to Cali's land. The contingency failed when Alfieri purchased the land in question. After that event, Cali could no longer sell the land or lease it to anyone, and plaintiff's expectancy of a commission with respect to such a transaction was at an end. Cali had a perfect right to sell the land to Alfieri and Alfieri had an equally perfect right to buy it.
I cannot see how plaintiff's expectancy could have precluded Alfieri from purchasing this land, and my colleagues do not even suggest otherwise. Moreover, see George F. Hewson Co. v. Hopper, 130 N.J.L. 525 (E. & A. 1943). The Alfieri-Cali contract was not contingent upon execution of the Reitman lease, and the conduct of the parties to the contract negate that such was an unspoken contingency. Again, the undisputed evidence is that the soil contingency to the Alfieri-Cali contract was disposed of on May 8, 1973 by a letter addendum to the April 18, 1973 contract, precisely *221 during the period when Reitman was declaring his determination not to lease from Alfieri and when he had embarked on the two-three-week search for alternative land sites. Notwithstanding Alfieri's knowledge of Reitman's declared determination not to deal with him, he (Alfieri) chose not to declare his contract with Cali at an end on the pretense of finding unfavorable soil conditions, but rather chose to settle that problem by agreement, thus rendering his obligation to Cali irrevocable. All of the evidence in the case, from the beginning of Alfieri's interest in the land through his oral agreement with Cali on March 16, 1973 to his written contract and settlement of the soil contingency clause, absolutely negates any notion that his purchase was in any way contingent on the successful consummation of the Reitman lease. No jury could have found otherwise.
Plaintiff never acted on behalf of Alfieri; Alfieri never asked him to do so. Plaintiff did not introduce Reitman to Alfieri; Reitman approached Alfieri directly. Although it's undoubtedly true that plaintiff introduced Reitman to the land when it was owned by Cali, plaintiff did so for Reitman and then for Cali's benefit, not for Alfieri's. Although it is also undoubtedly true that Alfieri derived a benefit from plaintiff's activity in introducing Reitman to the land, that fact does not convert Alfieri's refusal to pay commissions into a tort, at least in the absence of any consensual basis for such an obligation, implied in fact or law. The case was not pleaded or submitted to the jury on any theory akin to quantum meruit or quasi contract, probably because plaintiff realized that the essentials of such a recovery were absent from the case. In Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105 (App. Div. 1966), defendant developer received the benefit of shrubs placed upon the land by plaintiff for another. A judgment for plaintiff was reversed despite the benefit received, because at the time plaintiff installed the shrubs it expected remuneration from another, not from defendant. As stated by the court:
*222 They [plaintiffs] had no dealings with defendant, and did not expect remuneration from it when they provided the shrubbery. No issue of mistake on the part of plaintiffs is involved. Under the existing circumstances we believe it would be inequitable to hold defendant liable. * * * A plaintiff is not entitled to employ the legal fiction of quasi-contract to "substitute one promisor or debtor for another." [at 109-110]
See also, Gould v. Amer. Water Wks. Service Co., 52 N.J. 226 (1968); Shapiro v. Solomon, 42 N.J. Super. 377, 383-384 (App. Div. 1956).
So in the present case  during the extended period of time plaintiff acted on behalf of Reitman, and then for Cali on the latter's express agreement to pay plaintiff commissions on any successful transaction with respect to the land, plaintiff expected, and could have expected, no commissions from defendant. Before Alfieri's purchase there existed no relationship between plaintiff and him. Plaintiff never operated under any mistake of fact with respect to this expectancy, and no fraud on Alfieri's part deprived plaintiff of its expectations of a commission. Again, the only conduct on the part of Alfieri which deprived plaintiff of its expected commission was Alfieri's purchase of the land  a transaction which, I submit, cannot be deemed a malicious act interfering with plaintiff's expectations. See George F. Hewson Co. v. Hopper, supra.
Moreover, plaintiff was at all time well aware of the ever-present hazard to its commissions from the sale of the land to another. The record is rife with references to plaintiff's sense of urgency, which it communicated to the principals by counselling speed in negotiations by almost daily telephone calls. In fact, it was in recognition of the hazard of what actually did occur that plaintiff urged Reitman to procure a 45-day option on the land from Cali for a price of $10,000, which Reitman declined to do. Apparently Reitman was so undecided about the land and his intentions with respect to it that he declined to put up the money necessary to provide him with some freedom of action. Hence *223 the Alfieri-Cali contract came as no surprise to plaintiff, but merely as the realization of its worst fears. Moreover, plaintiff was not without the means of self-protection. As a broker of substance, accustomed to dealing in large figures with substantial industrial property, it could have exacted from Reitman an obligation to pay commissions for the substantial work plaintiff was doing on his behalf in the event such commissions, for any reason, were not forthcoming from the seller. It chose not to do so, probably because it feared loss of a client. It took its risks in that regard and cannot now put the consequences on defendant who asked it do nothing.
In short, my analysis of this interesting case convinces me that the expectancy of economic advantage which measures the damages imposed upon Alfieri was plaintiff's contract for commissions with Cali. The event which terminated that expectancy was the Alfieri contract, an arms-length, bona fide transaction for a substantial purchase price, not contingent upon the execution of a lease with Reitman, procured through the offices of another broker who was paid a full commission for his services. Cali had a right to sell to Alfieri and Alfieri had a right to purchase from Cali. There is not the slightest suggestion that Alfieri and Cali had any prior relationship. The April 18, 1973 Alfieri-Cali contract was the only event from which plaintiff's loss of expectancy can be traced.[3] At the time, its loss was total except perhaps if the transaction failed to close for some reason. Nothing that occurred thereafter could increase this loss, and nothing did. Neither the secrecy which my colleagues perceive nor Alfieri's participation in the Cali bid submitted after April 18, 1973 could have caused any loss. Indeed, as a result of Alfieri's negotiations with Reitman, *224 new terms were agreed to; Alfieri insisted upon $1.75 a square foot as the rental rather than the $1.70 a square foot rental the Cali bid had disclosed. Plaintiff's contention on appeal that Alfieri simply took over the Cali-Reitman lease prospect is simplistic and unrealistic. First, Alfieri, as previously noted, did no such thing; he made a better deal for himself. Second, he could not take over the deal; he had no power to do so. There was no deal at the time and Reitman had to agree to any deal which was proposed. And, as has been noted, Reitman initially refused to deal with Alfieri. In any event, and viewed in its legal aspects, whether all that was so or not, such events, the secrecy and Alfieri's participation in the designing of Cali's bid had no effect whatever, that I can discern, on plaintiff's loss. Had those events not occurred, plaintiff's loss would have been the same.
One of the essentials of a recovery for malicious interference with prospective economic advantage is that the act of malicious interference must have been the cause of plaintiff's loss. Prosser, Torts (4 ed. 1971), § 130 at 953. All of the reported cases so require either expressly or by necessary implication. I agree with my colleagues that plaintiff's claim cannot be condemned simply because the facts underlying it fail to parallel those of any reported case. Each case must indeed be decided upon its own facts since the conduct resorted to bilk brokers of their legitimately expected commissions can never be predicted with precision. The law must be equal to perfidy, whatever form it takes.
Nonetheless, the decided cases should not be ignored. They do set forth a standard and from them can be extrapolated the essentials of the tort without which no action will lie, and one of those elements is that the condemned conduct, whatever its form, must have occasioned the loss. Harris v. Perl, 41 N.J. 455 (1964), which my colleagues regard as the principal support for their conclusions, does not hold otherwise. In Harris the defendant, ultimately held liable for his broker's commissions, had retained the broker to *225 find him a residence. In response to this request the broker performed services with the desired result  the residence defendant wanted and at the price he was willing to pay. Moreover, defendant knew that for the services being performed by the broker at his, defendant's request, the broker expected to receive commissions from the seller of the residence. During the period of negotiations, however, defendant came into possession of knowledge which he thought would enable him to purchase the residence at his price but without payment of the broker's commissions. He had learned that during negotiations title to the house had passed to a bank, also a party, in payment for a preexisting debt of the seller. Accordingly, he put off his broker with a fib, telling her he was too busy to talk to her, so that he could instead deal directly with the bank for the sole purpose and with the effect of contracting with the bank for the purchase of the residence without the price reflecting the amount of commissions his broker had been expecting. The court was careful to point out that had he dealt fairly with his own agent by disclosing his knowledge that the bank was the title holder, the broker could have attempted to obtain recognition from the bank and an agreement on its part to pay the commissions. Moreover, the court made clear that the bank's agreement to pay the commissions before disclosure of the purchaser's identity was a virtual certainty had it been asked to do so, thus forging the causal link between the tortious act and plaintiff's loss so conspicuously absent in this case. Id. at 461. It was defendant's failure to disclose to his broker that the bank was the title holder for the purpose and with the effect of depriving her of the opportunity to obtain recognition, which would have been forthcoming, that was the basis for the recovery.[4]
*226 Hence, from Harris v. Perl, supra, can be extrapolated the following requirement for the tort: (1) a broker's legitimate expectation of commission for services performed; (2) an act of doubtful moral quality which was motivated by defendant's desire to deprive the broker of the commission expected and which had that effect, and (3) that had the act not been performed, the broker would, in all probability, have collected the expected commission.
The same analysis of the earlier Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 586 (E. & A. 1934), yields the same principles. There, the broker's cause of action was held sustainable on the theory that its disclosure to the seller of the identity of the prospective purchaser was made upon the assurance of a corporate seller's principal that the disclosure would be "held in the strictest confidence," and he (the broker) would not in any way be injured thereby. The proofs in that case justified the inference that the officer to whom disclosure was made violated that assurance of confidence, disclosed the purchaser's identity to his brother, a broker in competition with plaintiff, and that the motive of this disclosure was the payment of the commission to his brother, at the sacrifice of plaintiff's rights, in which disclosing officer was thereby enabled to share.
There, too, analysis discloses that (1) the broker had an expectation of commission from the seller; (2) defendant committed an act which was both breach of a contract of confidence and transgressive of generally acceptable moral principles (breaking one's word) which was motivated by the desire, and had the effect, of depriving the broker of the expected commission, and (3) had the act not been performed, the broker would have collected the expected commission, the element lacking in this case.
In Sustick v. Slatina, 48 N.J. Super. 134 (App. Div. 1957), the seller, who had agreed orally to pay commissions, *227 misled the broker into believing that no deal was possible in order to deprive the broker of the expected commission, and then the buyer and the seller, dealing personally, consummated a deal which profited them by the loss of the commissions which the seller had orally agreed to pay. The first element was present because the statute of frauds had been waived and the oral agreement was therefore fully enforceable. The second element was satisfied in the deception of the broker by leading him to believe no deal was possible, for the purpose of depriving him of his expectations. Had they not deceived the broker in order to deal personally with each other, the commissions would almost certainly have been paid.
In Brenner & Co. v. Perl, 72 N.J. Super. 160 (App. Div. 1962), the seller waited until expiration of his agreement with his broker before selling to the buyer in order to beat his broker out of his expected commissions. The waiting, for the specific purpose of escaping liability for commissions otherwise owing by contract, was the act of interference with the broker's contractual right to commissions which was considered the tort. Without the delay occasioned only by the desire to avoid commissions, the commissions would have been collected.
Finally, in McCann v. Biss, 65 N.J. 301 (1974), the broker's suit in tort failed for failure to satisfy the first of the three elements, no legally enforceable claim to commissions, and hence no expectation of which he could be deprived. There, the broker had been denied commissions when the seller, who had orally agreed to pay them, had dealt directly with the buyers who had been introduced to the property by the broker. Recognizing that the claim on the contract could not be maintained for noncompliance with the statute of frauds, the court considered the issue of whether, in such situations, a broker denied commissions for failure of the owner to honor the oral agreement to pay them, could recover them by resort to a tortious interference theory. The court held that he could not, saying:
*228 We are of the opinion that, as a general proposition, a broker, who may not recover commissions from a seller directly by reason of the statute of frauds, may not accomplish the same result indirectly by a claim against the seller for wrongful interference with the broker's reasonable expectancy of the economic benefit. That expected benefit has to be the payment of commission by the seller, but the basis thereof is in turn the oral agreement between broker and seller which is void and unenforceable by reason of the statute.[5] Such a claim actually seeks to enforce the oral agreement, amounts to an effort to evade the statute, and like a claim in quantum meruit, would substantially undercut the law and its spirit. [at 310].
The common thread running through all of the decided cases, and indeed through all tort law, is that conduct condemned as tortious becomes actionable only when it causes a loss, or when loss is presumed, as in cases, for example, of libel or slander per se. The loss so caused provides the measure of compensatory damages. In this case plaintiff's loss was caused by the Alfieri purchase of the land to which plaintiff introduced Reitman. Following that transaction plaintiff's expectations had come to an end, not through any tort but as the normal result of competition when another, privileged to do so, bought the land for which plaintiff was negotiating. The majority opinion recognizes this fundamental principle when it notes the necessity for "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." I agree with that principle. But its application to this case yields a result at variance with the one reached by my colleagues. Had Alfieri announced immediately to plaintiff the execution of the April 18 contract and had he not participated in designing the bid submitted by Cali, the result to plaintiff would have been the *229 same. It would not have been entitled to commissions. That principle is just another way of stating the requirement that the found tortious conduct must have caused, or at least contributed to, the loss; one test for determining such causal relationship is whether the loss would have been the same in the absence of such conduct. Here it was the same, and hence whatever Alfieri did, with the notable exception of purchasing the land, had nothing to do with plaintiff's loss or its extent.
I cannot ignore that my colleagues' opinion makes a fundamental change in the law regarding real estate brokers and their rights to a commission. In its effect the opinion seems to regard a broker's expectancy of commission arising from the introduction of a purchaser or lessee to the land as a charge thereon, running with the land as a covenant and binding on all subsequent purchasers having knowledge thereof. Not only is such a view unsupported by authority but it runs directly contrary thereto. George F. Hewson Co. v. Hopper, supra. Although I would have no objection to considering this form of liability as a new principle, the parties have not asked us or the trial court to do so, and I question whether this is the court for such an undertaking.
As to a recovery in quantum meruit, I have previously suggested wherein the present matter lacks elements essential to that form of recovery. I see no reason to expand the scope of that well-defined doctrine to eliminate the disappointments of only real estate brokers. Further, the essential nature of a broker's expectancy provides further reason for approaching a quantum meruit recovery with caution. A broker's expectancy of a commission with respect to any transaction is a contingent one and hence the rate which measures it is designed with knowledge that in some transactions no commissions at all will be forthcoming. The commissions derived from a successful transaction must cover those instances where, despite considerable effort, no commission is collectible. The rate of commission exacted from *230 a seller, by the latter's agreement, bears no necessary or even probable relationship to the effort expended in a given transaction. For example, one telephone call or introduction can result in a sizeable commission, whereas, in another transaction, considerable effort will result in none. See, e.g., American Trial Lawyers Ass'n v. New Jersey Supreme Ct., 126 N.J. Super. 577 (App. Div.), aff'd 66 N.J. 258 (1974), wherein the court noted that contingent fee arrangements are contracts for "a method for compensation which bears no direct relationship either to the effort expended * * * or the actual value of the services." 126 N.J. Super. at 592. Nothing in this case suggests that plaintiff's efforts on Reitman's or Cali's behalf are worth in excess of $250,000. Indeed, no evidence at all was received in support of that theory. I view as inequitable, therefore, the assessment of damages on the basis of a contingent expectancy where the contingency which underlay it has failed. To do so in the present case results in giving plaintiff more than was bargained for and probably more than could have been recovered on a quantum meruit basis.
I concede that it would have been a nice thing for Alfieri to have voluntarily agreed to pay in excess of $250,000 in commissions since he did derive benefit from plaintiff's activity. On the other hand, it is not exactly unusual for him to have declined to do so. Many people would. More importantly, I don't view this one tort, that of alleged malicious interference with economic advantage, as the only tort wherein a jury may, without more, assess substantial damages whenever it takes issue with the morality of a defendant's actions which cause no loss. And yet, that is precisely what this jury was asked to do in this case, and undoubtedly what it did. They obviously felt that Alfieri should have paid the commissions because he received benefit from plaintiff's introducing Reitman to the property. I don't conceive such facts, without a good deal more, as a proper basis for recovery.
I would reverse and enter judgment for defendant.
NOTES
[1] M. Alfieri Co., Inc. was dismissed from the action. Hereinafter the Alfieri defendants against whom judgment was entered will include said defendants except M. Alfieri Co., Inc.
[2] The actual verdict was for "five percent of the gross rentals" on the lease between Creston Associates, a partnership (part of the group designated as the Alfieri defendants) and Galsworthy, Inc., a corporation included as one of the Reitman defendants.
[3] Reitman and Cali had tentatively agreed to a price of approximately $47,500 an acre for about 14 1/2 acres. Alfieri's purchase was of a larger tract which included the land which Reitman was going to buy from Cali.
[4] Stein was required to remain outside the meeting room during the initial discussions and then was invited in.
[5] An example of the possible problems sought to be avoided by Alfieri is furnished by a letter sent to Reitman on May 4, 1973 claiming a commission from the Reitman defendants if they either purchased or entered into a lease with the Alfieri defendants.
[6] The judge subsequently corrected the erroneous figure of five years by telling the jury the first option was after ten years.
[1] Reitman's architect did not finish his work until April 1, 1973 because, as he testified, Reitman had still not decided where he wanted to locate his building. Alfieri had, by March 16, 1973, two weeks earlier, orally agreed on a purchase price for the entire tract.
[2] The court's suggestion that perhaps someone else's soil-testing rig was brought on the land is both unsupported and unavailing. The presence of any rig would have provided Reitman with notice of another's interest in the land.
[3] The charge did not, however, inform the jury of the possible significance of the Cali-Alfieri sale upon plaintiff's right to commissions and, hence, they might well have overlooked the effect that the sale had on plaintiff's expectation of a commission.
[4] The bank title holder was the party in a position similar to Alfieri's, a subsequent grantee. The bank obtained summary judgment in its favor on the broker's claim against it. Apparently no appeal was taken from this determination. The purchaser's claim against the bank for contribution as a joint tortfeasor also went unresolved.
[5] Although the statute of frauds, N.J.S.A. 25:1-9, pertaining to real estate brokers, is not here applicable because a lease rather than a sale is involved, the statute underscores the necessity for agreement, even oral in the case of leases, as the basis for imposition of liability for commissions.